## JOSEPH R. BASSETT *vs.* JOHN H. BROWN.

**A** broker procured to be made to himself a deed of land which he was employed to sell, the grantor intending it only as a means of carrying into effect a supposed sale to a third person, but the grantee secretly intending to obtain the land to his own use, and also fraudulently misrepresenting the value of the consideration, which consisted of certificates of stock in mining companies. *Held*, that the deed was not void, but only voidable, on either ground; and that, if the grantor, who learned within two or three months the facts which entitled him to avoid it on the first ground, and within a year afterwards those which entitled an avoidance on the second ground, neglected for more than two years and a half from the time of the conveyance to do any act to avoid it, and meanwhile sold or otherwise disposed of many of the stocks, exchanging a considerable part of them for other stocks after he had full knowledge of both grounds of avoidance, he must be taken to have ratified the conveyance of the land, and could not maintain a writ of entry to recover it.

On the issue whether certificates of stock in a corporation, given by the grantee as the consideration of a deed of land to him, voidable for his fraud, are absolutely valueless, and their return is not necessary as a condition of the avoidance, it is not sufficient that they have no intrinsic value and no market value, if they are capable of serving any purpose of advantage by their possession or control, or if their loss is a disadvantage to him in any way.

WRIT OF ENTRY dated August 4, 1869, to recover land in Marblehead. Plea, *nul disseisin.* At the trial in this court, at April term 1870, before *Ames,* J., after the demandant rested his case, the tenant introduced no testimony, and the demandant's evidence was reported to the full court, under an agreement of the parties, that if, upon the report, "and all legitimate and proper inferences therefrom," the demandant was not entitled to recover, the tenant should have judgment; otherwise, a new trial should be ordered. The following is the substance of the report:

In the autumn of 1864, the demandant, then owning the land, (which, he testified, cost him and was worth $20,000,) became desirous to sell it. The tenant was a broker in Boston, where the demandant also had a counting-room. By solicitation of the tenant, who had heard of the demandant's desire, the demandant employed him to sell the land, for the price of $15,000 in money, or $20,000 in exchange for other property; and promised to pay him $150 commissions for finding a customer.

The demandant's own testimony (which was reported in full) tended to show that the subsequent transactions were as follows:

The tenant after a while informed the demandant that he could not obtain a money offer for the land, but could trade it off for real estate in Boston ; the demandant replied that this would not be satisfactory ; and then the tenant said that he could get " first rate stocks " for it, upon which the demandant would double his money in a year, and exhibited a schedule of stocks, to the amoun of $60,000, which he said could be exchanged for real estate, and in reply to the inquiry of the demandant, (who testified that he knew nothing of their value,) as to which were the best of them, pointed out some, saying that they were very good and would enable him to double his money very soon, and made a selection from them for him by his request, and said that they belonged to a man who was absent in Canada and had put them into the tenant's hands to be exchanged for real estate. In reply to a request of the demandant to be referred to some person for information concerning these stocks, the tenant referred him to a man at the Tremont House, as owning a large amount of them, and able to tell all about them ; and the demandant called at the Tremont House soon afterwards, in company with one Farrington, a broker, and found the man, " a very well dressed and gentlemanly looking man," (whose name the demandant had forgotten,) and showed him a list of the stocks, and he said that he knew all about them, or " pretty much all," and that they were good, and he had no doubt would pay good dividends, and some of them had paid or were about to pay. The demandant thereupon " concluded to make the trade," and advised the tenant accordingly. All this happened before the beginning of the winter of 1864–1865.

Several interviews then occurred between the demandant and tenant, at which it was arranged that stocks should be taken by the former, at a valuation, put upon them by the latter, of $20,000 ; and that the deed of the land should express a consideration of $15,000. The tenant became apparently anxious to finish the transaction, and said that the man in Canada was expected home soon and it was necessary to close it, and that it was necessary for the demandant to execute the deed to the tenant in his own name, in order that he might manage the business. Finally, on February 4, 1865, the demandant executed a war-

ranty deed of the land to the tenant, who gave him some stock certificates and powers of attorney for their transfer, and took his receipt therefor. (The deed and the receipt were both annexed to the report.) Among the stocks included in the receipt, were 500 shares in the Brome Copper Mining Company, 600 in the Buckingham Plumbago Lead Company, 1000 in the Chaudiere Gold Mining Company, 200 each in the Etna and Gold Hill Gold Mining Companies, 375 in the Stafford and Chaudiere Gold Mining Company, and 11,500 in other gold and copper mining companies. The demandant at the same time paid the tenant $1350, to be applied to extinguish a mortgage on the land ; and $150, commissions. The tenant subsequently paid off the mortgage, and gave the demandant the mortgage note. On the same day on which the demandant received the stock certificates and powers of attorney, he put them into the hands of Farrington, " to dispose of and handle for him ; " and he never " handled " any of them himself until they were returned to him by Farrington, which was not " until the winter or spring of 1866."

Two or three months after giving the deed, the demandant asked the tenant how it happened that the title was still in the tenant's name, and said, " I am afraid that you have cheated and defrauded me ; your conduct shows it." The tenant answered, " I have been compelled to keep the property and shall lose money by it." To which the demandant said, " So shall I ; they tell me it is a bad transaction." And the tenant replied, " I will get you out of it ; it is all safe ; it is all as I told you it was ; you will get back every dollar."

At another time, afterwards, (but how long afterwards did not appear from the report,) the tenant said to the demandant, " You are all right ; I will get you out of it." The demandant then asked, " How is it that the title to the land is in your name still ? " And the tenant answered, " He has compelled me to buy it ; but don't you worry, I will get you out of it."

The demandant testified that he never received any dividend from any of the stocks which he took from the tenant, " and never could discover that they were of any value ; " that " he had never received anything, except something from Farrington

on certain shares in the Buckingham Plumbago Lead Company;" and that, after Farrington returned him the stocks, he "swapped off" the 200 shares each in the Etna and Gold Hill Mining Companies, and the 350 shares in the Stafford and Chaudiere Mining Company, with one Fuller, for "certain other shares, which were also worthless."

On cross-examination, the demandant testified that he had dealt in real estate and stocks, and at one time was member of a broker's board "by invitation;" that he had traded in Nova Scotia gold mining stocks, and "after he suspected himself to have been defrauded, which he did in the spring of 1865," he tried to deal in Nova Scotia stocks, to improve his condition; that he occupied the same counting-room with Farrington, and consulted with him in the transaction with the tenant and about the stocks which he took from the tenant; that of the 600 shares of stock in the Buckingham Plumbago Lead Company, included in the receipt, he never received from the tenant but 400; that of these Farrington disposed of 300, late in the spring of 1865, for $900 or thereabouts, and paid him the money, obtaining this price for them by means of a "corner," which the demandant defined as "a combination among operators, by which certificates of shares were locked up or kept out of the market, so that prices were raised and sellers were unable to deliver according to their contracts;" that "he left the disposition of the stocks wholly to Farrington as his agent;" that "eight, ten or twelve months after his suspicions were aroused" about the nature of the transaction with the tenant, he settled with Farrington and took the stocks back from him; that of the 1000 shares of stock in the Chaudiere Gold Mining Company only 500 now remained, and he could not tell what had become of the other 500, but thought that they might have been exchanged for some of the "Fuller stocks;" that his negotiations with Fuller occurred in 1866, and in cold weather, and he "sold Fuller the stocks that were not accounted for or now on hand, and would not swear that Fuller paid him no money in the transaction;" and that he had dealt in mining stocks for the last five years, and had lost all his property.

The report stated, that the tenant, soon after he took the deed of the land to himself, mortgaged the land to William R. Pedick, his brother in law, to secure a loan of $6500 for three years; that the demandant testified that he did not know of this mortgage until late in the summer of 1867, after he had consulted an attorney at law as to his rights and remedies; and that " it did not appear that (with the exception of complaining to the tenant as before mentioned) the demandant did any act, or took any active measures, in the way of rescinding the contract with the tenant, until August 16, 1867, at which time he filed a bill in equity against Brown and Pedick, which bill with the record of all proceedings thereon is to be referred to." See 100 Mass. 355.

Other evidence introduced by the demandant tended to show " that the stocks which he received from the tenant never had any intrinsic value; that some of them had no market value; that the companies generally were got up by projectors, who never paid in any capital stock except by turning in certain alleged mining rights at nominal and fictitious prices; and that, although some of them had a saleable value, they were generally very short lived, and soon became wholly unsaleable."

One of the witnesses, Joseph G. Martin, an expert who had kept a full record of stock fluctuations for twenty years, testified that the stock of the Brome Copper Mining Company was first put on the market in February 1864; that during the ensuing year sales of it were made at prices varying from 50 cents to $3.25 per share; and that there had been no sales of it since February 10, 1865; that in February 1865 no one could have disposed of the stocks which the demandant took from the tenant, for more than a few cents per share, except perhaps the Brome and Buckingham stocks; that possibly $100, and certainly not $1000, could have been obtained then for the whole lot; that there were then quotations of the Buckingham stock, and apparent sales of it, and bids were made for it at the brokers' board, which, if accepted, would have bound the bidders; and that " at this late day " the stocks were at nominal prices, had got into bad repute, were unsaleable for cash, and were " what the brokers call played out."

The demandant then "tendered in court and offered to place on file, for the use of the tenant, all the certificates of shares, powers of attorney for the transfer of shares, and other papers, received by him from Farrington," and also "offered in like manner new certificates, and powers of attorney, necessary and sufficient for replacing all other certificates and other vouchers received from the tenant and not specifically returned, and for returning to him as an equivalent the same numbers of shares that were received from him originally."

The demandant further offered to prove that none of the stocks had any market value since 1865 ; and also offered evidence that in January 1865, one Fiske, who was present at an interview between him and the tenant, said to the tenant, when the demandant left the room, "Bassett is crazy and not fit to do business," and the tenant answered, "Hush, I am going to get a good trade out of him," and that soon afterwards, at a time when the demandant wished to sell a harness to Fiske, the tenant dissuaded Fiske from buying it, and said to him, "I will buy the harness of Bassett for some of the mining stock, and sell it to you cheap."

*J. G. Abbott & I. S. Morse*, for the demandant.

*S. B. Ives, Jr.*, for the tenant.

WELLS, J. The evidence for the demandant tended to show that the tenant, while acting or pretending to act as the demandant's agent for the sale of the land in question, procured a deed of it to be made to himself. This was in form and in legal effect a conveyance of the title to Brown. But as the demandant intended it only as a means of carrying into effect a supposed sale to a third party, and the tenant concealed his purpose to obtain the property for his own use, the agent cannot maintain against his principal a title so acquired in fraud of the obligations pertaining to that relation. Aside from this relation, the evidence tended to show such deceit and fraud practised upon the demandant, in respect to the consideration in the transaction, as to render the deed voidable on that ground.

In either case the deed was voidable only, and not void. The title passed according to the terms of the deed, subject to the grantor's right to defeat it. The demandant was entitled, upon

discovering the facts, to elect whether to affirm the conveyance and retain the consideration, or to avoid it. If he would do the latter, he must return the consideration, or whatever property he may have received in exchange for that which he conveyed. *Thayer* v. *Turner*, 8 Met. 550. He must do it, or at least signify his election, within a reasonable time ; otherwise his continued silence, after knowledge of the facts which entitle him to disaffirm, will be construed as an election to affirm ; or an affirmance by acquiescence. Chit. Con. (10th Am. ed.) 489, 815. *Kimball* v. *Cunningham*, 4 Mass. 502. *Copeland* v. *Mercantile Insurance Co.* 6 Pick. 198. *Perley* v. *Balch*, 23 Pick. 283. Per Buller, J., in *Towers* v. *Barrett*, 1 T. R. 136. *Norton* v. *Young*, 3 Greenl. 30. If, after such knowledge, he continues to deal with the property received as his own, he thereby affirms the contract by which he received it. 2 Kent Com. (6th ed.) 613. Story on Sales, §§ 420, 446. *Hoffman* v. *Noble*, 6 Met. 68. *Leonard* v. *Morgan*, 6 Gray, 412. *Campbell* v. *Fleming*, 1 Ad. & El. 40. *Whitney* v. *Allaire*, 4 Denio, 554. Whether the act of avoidance is within reasonable time is a question of law, to be decided by the court, upon all the circumstances of the case ; unless something equivocal in those circumstances, or material facts in dispute, require a submission to the jury with instructions. *Holbrook* v. *Burt*, 22 Pick. 546, 555. *Haskins* v. *Hamilton Insurance Co.* 5 Gray, 432, 438. *Kingsley* v. *Wallis*, 14 Maine, 57. *Pratt* v. *Farrar*, 10 Allen, 519.

From the evidence adduced by the demandant in this case, it appears that within two or three months after the conveyance he became aware of all the facts which are now disclosed, in regard to the conduct of the tenant in taking and holding the deed of the land for his own use. We think it sufficiently apparent also, that as early as the winter or spring of 1866, when Farrington, who had been endeavoring, as his broker, for a year or more, to dispose of them, made return to him of the unsold stocks, and the proceeds of those sold, he must have come to a pretty accurate knowledge of the character of the commodity he had received for the land. This was, as he himself says, " eight, ten or twelve months after his suspicions were aroused " that he had been de-

frauded. After that he " swapped off" several hundred shares of the stocks to one Fuller.

In August 1867 he first took measures towards rescinding his conveyance to Brown. It does not appear that he then offered to return the stocks; or that he has done so at any time until the offer made by him at the trial.

We are all of opinion that. upon the facts as reported, and all legitimate and proper inferences therefrom, which might be drawn in his favor by a jury, the demandant shows no right to recover in this action.

In *Thayer* v. *Turner*, 8 Met. 550, an action of replevin, it was held that the avoidance must be made complete by an offer to restore property received in exchange, so as to revest the title, before bringing the suit. The cases, in which it has been held sufficient to produce at the trial, and there offer to surrender, that which was received as. consideration, are confined to those. in which the note of the purchaser was given for the property; *Thurston* v. *Blanchard*, 22 Pick. 15; or where the action was against a third party, who held the property with notice of the fraud, but who had no interest in the return of the consideration; *Stevens* v. *Austin*, 1 Met. 557; *Manning* v. *Albee*, 11 Allen, 520, and 14 Allen, 7; or where the action was for the price, not seeking to rescind the sale, but only the fraudulent transfer of worthless securities in payment. *Bridge* v. *Batchelder*, 9 Allen, 394.

The demandant contends that the stocks were worthless; and therefore it was unnecessary, as it would be useless, to return them. Such unquestionably is the rule of law, if they were absolutely of no value to either party. But it is not sufficient that they were of no intrinsic value, or of no market value. If they were capable of serving any purpose of advantage by their possession or control, or if their loss was a disadvantage to the tenant in any way, he was entitled to have them returned. This rule is held with great strictness in actions at law; as in the case of the casks that contained worthless lime, *Conner* v. *Henderson* 15 Mass. 319; and the sack that covered the rejected bale of cotton, *Morse* v. *Brackett*, 98 Mass. 205, and 104 Mass. 494.

In this case, it was not denied that the stocks were genuine, as shares of corporate capital; but it was claimed that such capital was made up of "alleged mining rights" only, and those put in at fictitious prices. The evidence tended to show that the real value of the shares was little or nothing, and their speculative value very small. But the demandant's own dealings with them proved that they could be used in the way of trade; and it was not shown that Brown might not have derived some benefit from them if they had been returned to him at the proper time. We think the evidence does not show them to be so absolutely of no value as to excuse the failure to return them. *Perley* v. *Balch*, 23 Pick. 283.

The cases above cited relate to sales of personal property. But we are aware of no difference between real and personal property, in respect of the necessity of a return of the consideration in order to rescind the contract of sale. The avoidance of a deed of land, on the ground of fraud relating to the contract or its consideration, can be effected only by a rescission of the entire contract. *Arnold* v. *Richmond Iron Works*, 1 Gray, 434. The exceptions, in cases of disability of the party, from insanity or infancy, are distinct recognitions of the general rule as here stated. *Gibson* v. *Soper*, 6 Gray, 279. *Chandler* v. *Simmons*, 97 Mass. 508. So also is the case of *Walker* v. *Swasey*, 2 Allen, 312, in which the parcel of land recovered was not included in the contract actually made by the parties.

Perhaps the same reason for a return before bringing an action for the property sold may not exist in real as in personal actions. But the difficulty in the way of a rescission of the contract by the demandant goes deeper than to defeat the present suit. Even if he may return other shares than those specifically which he received from the tenant, on the ground that all shares in the same corporation are alike, (which may be questioned, as a matter of strict legal right,) yet the fact that he retained them for two years or more after discovering the frauds of which he complains, endeavoring to sell them, and selling many of them, instead of returning them and reclaiming his land, is conclusive against his right to return them at this time in any mode. What rem-

edies at law or in equity he may now have, we need not con‑ sider.

The bill in equity, previously brought by Bassett to set aside the same conveyance, was dismissed on the ground that, upon its allegations, there appeared to be an adequate remedy at law. But that bill did not disclose any of the facts upon which we now hold it to be too late for him to return the stocks to Brown. It therefore, by not excluding the existence of a right to have com‑ plete remedy at law, failed to show jurisdiction in equity; and was necessarily dismissed upon demurrer. That judgment was rendered upon the pleadings alone.

According to the terms of the reservation, judgment is to be entered *For the tenant.*