## CHESTER SNOW *vs.* JOHN B. ALLEY.

Barnstable.  March 7, 8. — May 21, 1887.  FIELD, C. ALLEN, & GARDNER,
JJ., absent.

If A. delivers to B. certain bonds, for two distinct considerations to be performed
by B., the first for the benefit of a third person, whereby an advantage enures
to A., and the second for A.'s own benefit, and B. performs the first but not the
second, A. cannot, without returning to B. the benefit received from him,
rescind the contract, and maintain an action of tort in the nature of trover
against B. for the conversion of the bonds, by proof that B., when he entered
into the contract, fraudulently intended not to perform the second consideration,
although the benefit received by A. from the performance of the first consid-
eration is of such a nature that it cannot be returned.

DEVENS, J.   This is an action of tort in the nature of trover
for the conversion of one hundred and fifty Postal Telegraph
bonds, of the par value of $1000 each.   The plaintiff seeks to
maintain the action on the ground that the bonds were obtained
from him by fraud.   The facts as they appear by the defend-
ant's bill of exceptions are as follows :

In the summer of 1881, the plaintiff, with certain persons
named Roberts and Cummings, and others, organized in New
York a corporation called the Postal Telegraph Company.   The
original capital was $30,000.   At the time of the organization
of the company, the plaintiff was interested in, and the owner
of, certain patents appertaining to telegraphy, and was in pos-
session of a bond for a deed of a certain factory situated at
Ansonia, Connecticut, belonging to Wallace and Sons, and used
for the purpose of manufacturing a patent telegraphic wire
formed by the deposit of copper around a steel core, to which
the plaintiff's patents related.   The sum of $90,000 had been
paid by the plaintiff's associates toward the purchase of this
factory, in consideration of which the bond had been given.
No part of this sum had been contributed by the plaintiff.   The
Postal Telegraph Company was organized for the purpose of
acquiring the factory and patents, a system of telegraphy in-
vented by Professor Gray, called the Harmonic, another system
called the Leggo Automatic, and to build a telegraph line
from Chicago to New York for the purpose of testing these

inventions, which it was believed, if successful, would revolutionize telegraphy and furnish a much cheaper system than the one in use.

At the time of the organization of the company, the plaintiff was one of the organizers, and a member of the company. For the purpose of acquiring these patents and properties, and raising the money to build the line to Chicago, and between all important cities in the United States, it was agreed between the parties in interest, including the plaintiff, but not the defendant, in the fall of 1881, that the capital stock should be increased to $21,000,000, and that the property should be mortgaged to the Farmers' Loan and Trust Company, of New York, to secure the payment of $10,000,000 of bonds of the par value of $1000 each, to be issued by the Postal Telegraph Company. The vote to increase the capital stock and authorize the issue of the bonds was not actually passed until March 9, 1882, after the defendant had become interested in the corporation.

The enterprise was substantially at a stand for want of means, when, on February 25, 1882, Roberts, Cummings, and others, with the knowledge of the plaintiff, visited the defendant at Washington in order to enlist him in the scheme, and to get him to invest his money and use his influence in favor of the company, the parties relied on to furnish funds to carry on the postal telegraph enterprises having declined to go further. This was the first connection which the defendant had with the promoters of the Postal Telegraph Company, although he had previously become interested in the Harmonic system. The defendant at this interview agreed orally to come into the enterprise, and help carry out the arrangements previously made with the plaintiff and others, if on investigation it appeared favorable, and satisfactory arrangements could be made. Subsequently, on March 7 and 8, an interview was held at New York between the plaintiff, the defendant, Roberts, Cummings, and others, in which the defendant finally agreed to come in and use his efforts in behalf of the enterprise, and to subscribe $100,000 to a construction company to be formed for the purpose of building a line to Chicago, and to lend the Postal Telegraph Company $100,000, and more if necessary, (Roberts subscribing and lending an equal amount,) and to use his efforts

to advance, equally with Roberts, the money necessary to complete the payment due from the Postal Telegraph Company for the factory, which was then supposed to be about $260,000, but which, by agreement with Wallace and Sons, was afterward reduced to $160,000, and interest; to advance to Professor Gray, or for his account, what money was necessary to free the Harmonic system from certain liens and pledges to which it was subject, and to put it into the Postal Telegraph Company free from such liens and pledges.

There was evidence tending to show that the one hundred and fifty bonds which are the subject of this suit were given to the defendant by the plaintiff as a bonus to induce the defendant to come into the enterprise and do the above things, and for all the advantage he was going to be to the Postal Telegraph Company, and for the risk which he was to incur; and that the agreement on the part of the defendant to do the above things was the consideration which induced the plaintiff to give the defendant the bonds. There was no evidence tending to show that the defendant lost any money or made any money by reason of his doing anything which he promised to do, or which he did in connection with the Postal Telegraph Company, or by his connection with these enterprises.

The plaintiff testified that he declined to give the bonds for the foregoing considerations solely, but that it was further agreed that no bonds should be sold till the line was completed to Chicago, and that the defendant would buy thirty-two bonds of the plaintiff, and pay him fifty cents on the dollar for the same, and lend him $20,000 on other bonds than the thirty-two or the one hundred and fifty aforesaid, and that this agreement was part of the consideration for the one hundred and fifty bonds. The making of this last agreement was denied by the defendant, who testified that he never intended to lend the plaintiff any money on bonds, or buy any of the plaintiff's bonds, as the plaintiff had testified, because he never promised to do so. The things which the defendant and those associated with him were to do were relied upon to enhance the value of the bonds and stock; and there was evidence offered by the defendant tending to show that what he did do enhanced the market value of the stock and bonds of the Postal Telegraph Company.

The defendant did not contend, and there was no evidence tending to show, that he had lent or otherwise given any money or other property directly to the plaintiff for the one hundred and fifty bonds; but the defendant contended that the consideration for the same was the advantage which the defendant was to be to the Postal Telegraph Company, the things he was to do for it, the advances and subscriptions he was to make, the risk incurred thereby, and the enhanced value of the bonds and stock which would result to the plaintiff. The success of the Postal Telegraph Company, and the value of its bonds and stock, depended on its ability to purchase the factory at Ansonia and to build the line to Chicago.

There was no dispute that the defendant fully performed all the agreements made by him, in consideration of which he had received the one hundred and fifty bonds now in controversy, unless he also agreed to lend the plaintiff the sum of $20,000, and to purchase of him the thirty-two bonds at not less than fifty cents on the dollar, fraudulently intending not to do so. As the agreement, in regard to the loan and purchase of bonds, was distinctly denied by the defendant, it was a denial by necessary inference that he fraudulently intended not to keep such an agreement.

The defendant by his eighth and ninth requests asked the learned Chief Justice of the Superior Court, who presided at the trial, to instruct the jury as follows :

" If the parties entered into a contract by which the defendant agreed to advance money, by way of loan or otherwise, either to Professor Gray or to the Postal Telegraph Company, or for the construction of a telegraph line, or for the purchase of a factory at Ansonia, or for any other purpose, and the defendant did thereupon lend or advance any substantial part of the money he agreed to lend or advance, and said loans or advances have not, before the commencement of this suit, been repaid to the defendant, the contract is not rescinded, and this action for the bonds cannot be maintained.

" The plaintiff cannot maintain this action while any part of the contract, so far as the same has been performed in whole or in part by the defendant, has not been rescinded. He cannot avail himself, for his own use or that of the company in

whose behalf he was contracting, of the defendant's advances, or of the benefit of the defendant's acts, and at the same time recover back the consideration for those advances or acts in this action."

Without now considering whether the jury was justified in so finding, we assume, for the purposes of the present discussion solely, that the defendant did promise as the plaintiff alleged, and that he fraudulently intended not to keep the promise so far as the loan of $20,000 and the purchase of the thirty-two bonds are concerned. The learned judge declined to give the instructions above stated, which had been requested by the defendant. He stated the considerations upon which the evidence tended to show that the plaintiff was induced to part with his bonds; namely, " that the defendant was to furnish or procure money so as to cause the incorporation of the Harmonic Telegraph Company with the Postal Telegraph Company; that the defendant should furnish or procure money for the Ansonia factory; and that the defendant should build, or cause to be built, a line according to the Postal Telegraph system to Chicago." " Apparently," he adds, " there is no dispute that these three considerations enter into the arrangement by which these bonds passed from the plaintiff to the defendant." He then proceeds to the inquiry whether there was a fourth consideration, in the proposed loan and purchase of bonds, and, after instructing the jury as to the rule which should govern in determining whether there was any such consideration, continues: " If the fourth consideration is proved, and you are satisfied that it had a material influence upon inducing this plaintiff to surrender his bonds, in other words, that unless the defendant had promised to buy thirty-two bonds at $500 a bond, and lend $20,000, he would not have given him the bonds, — if you should be satisfied of that, and that there was fraud in the promise, — then the plaintiff may recover notwithstanding those other considerations combined with this to induce him to give up the bonds."

It is conceded by the plaintiff, in his argument, that " it must also, under the ruling of the court, for the purposes of this inquiry, be assumed that the promises for the benefit of the Postal Telegraph Company had some influence in inducing the plaintiff to part with his bonds; that those promises were made

in good faith, and have, to some extent at least, been performed by the making of loans and advances, and that all of said loans and advances had not, before the commencement of this suit, been repaid to the defendant."

The right to rescind or avoid a contract proceeds upon the ground that a party has been fraudulently betrayed into making it, and, having thus been induced to part with his own property, may resume possession of it on returning that which he has himself received, and thus placing the other party in the same position that he was before the contract was made. If that which he returns is diminished in value by natural causes, or in the ordinary and proper use of it, he may still return it, as in such case, the contract being rescinded, such diminution is the loss of the original owner. *Res perit domino.* But, if it be injured by his own negligence, he cannot return it, and his right to rescind the contract is gone. Where property is entirely worthless, it need not indeed be returned ; but so strictly has the rule been held, that articles which are of the slightest value, or the loss of which may be a disadvantage in any way, must be returned, even if they have no intrinsic or no market value, as casks containing worthless lime, or sacks which have been on bales of wool. *Conner* v. *Henderson*, 15 Mass. 319. *Morse* v. *Brackett*, 98 Mass. 205. See also *Bassett* v. *Brown*, 105 Mass. 551 ; *Estabrook* v. *Swett*, 116 Mass. 303.

Where the promissory note of a party against whom a rescission of a contract is claimed has been given to the rescinding party, it is sufficient indeed for the latter to tender a return of it at the trial; for, as between the parties to it, this is not property, but a promise only. *Thurston* v. *Blanchard*, 22 Pick. 18. *Bridge* v. *Batchelder*, 9 Allen, 394.

Where property also has passed into the possession of a party cognizant of the fraud, it may be reclaimed, without proving that the defrauding party has been restored to his original position. In such case the party in possession of the property known by him to have been obtained by fraud is not in a position to raise the question whether restoration has been made or not. This is *res inter alios*, with which he has no concern, and is irrelevant to the issue at the trial. *Stevens* v. *Austin*, 1 Met. 557. *Manning* v. *Albee*, 11 Allen, 520 ; and 14 Allen, 7.

If a wrongdoer who has obtained property by fraud has made expenditures upon it enhancing its value, he has no claim for these expenditures against one who, by reason of the fraud practised upon him, is entitled to demand its restitution, and who himself restores all which he has received, or tenders the restoration of it, when he rescinds the contract. In such case the wrongdoer is in a situation analogous to that of a trespasser who wrongfully converts a chattel and increases its value by labor bestowed upon it. *Guckenheimer* v. *Angevine*, 81 N. Y. 394.

In the case at bar, the parties to the original contract are before us. There was no attempt to place the defendant in the position in which he was before the contract, and the claim of the plaintiff is, that he may avail himself of all the advances made by the defendant in subscriptions and loans, of his efforts to interest others in the Postal Company, and of his services as its treasurer, the result of all which, as there was evidence tending to show, was largely to increase the value of the stock and bonds in which the plaintiff had an interest, so far as nominal values are concerned, of over $3,000,000, and that he may recover from the defendant the full value of the one hundred and fifty bonds, which he gave him in consideration that the defendant would do these things, upon the ground that the defendant also promised to lend $20,000, and purchase, for $16,000, thirty-two bonds, and that he did not perform and fraudulently intended not to perform this latter promise, it being one of the inducements to the contract.

That, if in any particular the defendant has failed to perform the contract which he made, intending not to perform it, the law will give the plaintiff a remedy by an action for deceit, in which the damages will be appropriate to the injury he has suffered, is readily conceded. It is quite a different proposition that the plaintiff may enjoy all the benefits he has received from the performance of a contract in its three most important particulars, and yet, retaining all these benefits, may abrogate it entirely on the failure of the other party to perform in a single particular, and may treat as his own and thus recover all the property which he has transferred in consideration of the contract.

While the loans and advances made by the defendant were not repaid him, which apparently might have been done, it is obvious also that there was an impossibility in restoring him to his original position in other respects, even if as to these it was possible. The risks he had run by the loans and advances made by him, the exertions he had made and the success of those exertions in inducing others to make loans or subscriptions, and the results he had achieved, by which the immense block of Postal Telegraph Company stock and bonds belonging to the plaintiff had been largely increased in market value, could not have been adjusted and paid for by any satisfactory or practicable scheme of compensation.

It is not in our view important that the acts which the defendant was to do (with the exception of the alleged loan to the plaintiff and the purchase of his bonds) were all to be done, and were in fact all done, immediately for the benefit of the Postal Company, and not for that of the plaintiff individually. The large interest which the plaintiff had in this company caused such acts, if successful in their results, to enure to the plaintiff's benefit, and this to the extent that he was interested therein. They were done also in carrying out the contract made with the plaintiff, as he had seen fit to make it. Even if the considerations which an alleged defrauding party performs go to the benefit of an independent third party, they would not be on that account the less good and sufficient considerations to support the contract made by the alleged defrauded party, if they thus went in pursuance of the agreement, and at his request. *Hubon* v. *Park*, 116 Mass. 541. *Turner* v. *Rogers*, 121 Mass. 12. *Cottage Street Church* v. *Kendall*, 121 Mass. 528.

The contention of the plaintiff is, that, when the consideration of a contract is entire, but the promises by the defendant are several, and all of them except one have been honestly performed, which one he wrongfully intends not to perform, such contract may be repudiated and rescinded by the aggrieved party, and all that he conveyed in consideration thereof recovered back, without restitution on his own part of the benefits he, with the other parties associated with him, has enjoyed, if such restitution from the nature of the things done and contracted to be done by the defendant is practically impossible.

He urges, that it is only when the injured party by his own act has put it out of his power to restore what he has received, that he cannot rescind his contract.

The rule, as it has been repeatedly stated, is much narrower than this, nor have we found it anywhere judicially stated with the limitation which the plaintiff would place upon it. Indeed, the careful research of counsel on either side has not brought before us any case where the precise question now raised has been distinctly adjudicated, unless it be the case of *Metropolitan Elevated Railway* v. *Manhattan Elevated Railway*, 11 Daly, 373, 453, and 14 Abb. N. C. 103, 231. This is not a decision of the highest court of the State of New York, but it certainly does not favor the plaintiff's contention, as it is there held that where a party has, without any knowledge of any intention to rescind, and for no ulterior purpose, acted upon the faith of the agreement, and has lost rights thereby, and such rights cannot be restored, the injured party can obtain no relief, except through such reparation as an action at law to recover damages will afford.

There are a large number of cases in which it is not only said, but held, that, where restitution cannot be made, the party injured must seek his remedy in some other way than by rescission of the contract, and that an action of damages for the deceit practised upon him affords an ample remedy, to which he is unquestionably entitled. These cases do not, however, appear to have contained this element, that the benefit received by the party defrauded has been received in such form that from its nature it could not have been returned. *Bassett* v. *Brown*, and *Estabrook* v. *Swett*, *ubi supra*. *Cook* v. *Gilman*, 34 N. H. 556. *Gould* v. *Cayuga County Bank*, 86 N. Y. 75. *Worley* v. *Moore*, 97 Ind. 15. *Smith* v. *Brittenham*, 109 Ill. 540. *Potter* v. *Taggart*, 54 Wis. 395. *Bisbee* v. *Ham*, 47 Maine, 543.

The rule as given by most eminent judges certainly excludes the plaintiff in the case at bar from any right to rescind his contract, or to recover, in the form of action he has adopted, the value of the property he has parted with, and compels him to seek his remedy by an appropriate action for the injury he has sustained by the alleged failure of the defendant to make the loan and purchase contracted for. That in such action the rule

of damages would be entirely different from that adopted in the case at bar is readily seen, as in such action he could recover damages only for the injury he had actually sustained, while he has been permitted to recover, as the case was submitted to the jury, for the full value of all the bonds he parted with, no regard being had to the benefits he had received from the performance of the contract, so far as the defendant had actually performed it, or to the burden which the defendant had necessarily sustained in such performance.

" Where a contract is to be rescinded at all, it must be rescinded *in toto,*" says Lord Ellenborough, " and the parties put *in statu quo.*" *Hunt* v. *Silk,* 5 East, 449. That this is a correct statement of the principles upon which the right to rescind a contract must rest has never been questioned, and it has often been adopted *in verbis.*

" When once it is settled that a contract induced by fraud," says Mr. Justice Crompton, in *Clarke* v. *Dickson,* 1 E. B. & E. 148, " is not void, but voidable at the option of the party defrauded, it seems to me to follow that, when a party exercises his option to rescind the contract, he must be in a state to rescind; that is, he must be in such a situation as to be able to put the parties into their original state before the contract." This expression is quoted, and its principle adopted, in *Urquhart* v. *Macpherson,* 3 App. Cas. 831.

*Western Bank* v. *Addie,* L. R. 1 H. L. Sc. 145, was a case where the shares which were the object of an alleged fraudulent sale had been changed into those of a differently constituted company. Originally they were shares in an unincorporated company, which had afterwards become an incorporated one, with the usual statutory incidents. It was held, that there could be no rescission of the contract, on account of the impossibility of returning that which the injured party had received, and that he must seek his remedy by action against those who had deceived him. If the shares had simply depreciated in value, they would still have been the same, and might have been returned. The case also affirmed that of *Clarke* v. *Dickson, ubi supra,* and the language of Mr. Justice Crompton is again quoted.

In *Sheffield Nickel Co.* v. *Unwin,* 2 Q. B. D. 214, it is said by Mr. Justice Lush : " A contract voidable for fraud cannot be

avoided when the other party cannot be restored to his *status quo*. For a contract cannot be rescinded in part and stand good for the residue. If it cannot be rescinded *in toto*, it cannot be rescinded at all; but the party complaining of the non-performance, or the fraud, must resort to an action for damages."

Without quoting numerous other instances, both in England and in this country, in which the principle that contracts may be rescinded where fraud has been committed has been said by eminent judges to rest upon the fact that the parties can be restored to their original status, it is to be observed that the rule has always thus been stated in the decisions of this court.

It is said by Mr. Justice Morton, in *Perley* v. *Balch,* 23 Pick. 283, 286, where the controversy was as to certain goods alleged to have been sold under false and fraudulent representations: " The purchaser cannot derive any benefit from the purchase and yet rescind the contract. It must be nullified *in toto* or not at all. It cannot be enforced in part and rescinded in part. And, if the property would be of any benefit to the seller, he is equally bound to return it. He who would rescind a contract must put the other party in as good a situation as he was before; otherwise he cannot do it." A similar statement is made by Chief Justice Shaw, in *Thayer* v. *Turner,* 8 Met. 550.

" A contract," says Mr. Justice Wilde, in *Coolidge* v. *Brigham,* 1 Met. 547, " cannot be rescinded by one of the parties for the default of the other, unless both of them can be put in the same state as before the contract. It cannot be rescinded as to one party, and remain in force as to the other. It must be rescinded *in toto*."

In *Morse* v. *Brackett,* 98 Mass. 205, Chief Justice Bigelow remarked: " This case comes within the familiar principle that no contract can be rescinded unless both parties are restored to the condition in which they were before the contract was made. One party cannot insist on the validity of a contract as to one portion of the subject matter, and claim to set it aside or avoid it as to the residue." See also remarks of Mr. Justice Foster, in the same case; and of Mr. Justice Wells, in *Bassett* v. *Brown,* *ubi supra.*

The plaintiff relies much on the case of *Masson* v. *Bovet,* 1 Denio, 69, 74, and especially upon the language there used,

that " the law cares very little what his [the fraudulent party's] loss may be." In that case the rescinding party had restored to the defrauding party all that he had received; and the general rule that he who would rescind a contract must return, or offer to return, all that he has received, is distinctly recognized. All that the case decides is, that, if the effect of such restoration is not to extricate the defrauding party from the condition in which he finds himself by reason of his fraud, he has no ground of complaint.

In *Hammond* v. *Pennock*, 61 N. Y. 145, where *Masson* v. *Bovet* is quoted with approbation, it was decided that the defrauding party could not prevent a rescission of the contract, because after making it he had himself done that which prevented his being restored to his original position. In that case he had sold and contracted to sell some of the land which was the subject of the contract, and it was held that in a suit in equity he might be compelled to transfer such of the land as had not been sold, the proceeds of such as had been sold, and to account for the proceeds so far as they could then be traced.

In neither case was the defrauded party released from his obligation to restore all that he had received. The other party was thus placed in the same condition that he was in before the transaction, so far as the two parties were concerned. Even if the effect of this restoration had not been, by reason of difficulties which the fraudulent party had himself created, and which were not things done in pursuance of the contract, to extricate him from all the embarrassments in which he had involved himself, the other had still relinquished all the benefits which he or others acting with him had received by virtue of the contract, and the defrauding party had been restored to the position in which he stood before the contract was made, so far as any change had been caused by that which had been done pursuant to the contract.

We are of opinion, that, independently of authority upon the subject, the position that the avoidance of a contract becomes impossible only when the defrauded party has disabled himself from restoring what he has received, as by conveyance thereof, cannot be sustained upon grounds of reason and justice. We cannot hold that he may retain the benefits of such a contract.

whether received by himself or by those in behalf of whom he acts, if it becomes practically impossible to reinstate the defrauding party in his original position by restoring what has been received, and that, having annulled the contract without such restoration, he may recover back all that he parted with, if the other party to the contract has, in any particular, fraudulently failed in the performance of that which was an inducement to the contract. It is quite certain that the learned court which used the expression on which the plaintiff has much insisted, " the law cares very little what his [the fraudulent party's] loss may be," could not have intended thereby to say that a party, however fraudulent his conduct may have been, was not to be dealt with fairly. No man, however wrongly he may have conducted himself, is without the pale of the law, or beyond its protection ; nor can fraud or wrong ever be righted by injustice. *Pearsoll* v. *Chapin*, 44 Penn. St. 9.

It is not through any action of the defendant that the plaintiff is unable to return the benefits he and the company in which he is so deeply interested have received from the moneys and the exertions of the defendant. The difficulty arises from the highly complicated series of transactions into which they mutually entered, and the magnitude of the enterprise in which they by mutual agreement embarked. The plaintiff was not brought into the Postal Telegraph Company and other collateral schemes by the defendant, or induced by him to receive the loans, advances, subscriptions, &c. which the defendant agreed to make, and has made, as the consideration (or part of the consideration) for which he was to receive the one hundred and fifty bonds. It was the plaintiff and his associates who induced the defendant to come in and interest himself in their enterprise. If, in any particular, the defendant has fraudulently failed to perform his contract, it is altogether just that he should pay to the plaintiff the damage he has occasioned by such failure, but there is no reason why he should be further liable than this. A civil proceeding is not intended to inflict punishment upon any one, still less a punishment which shall enure to the advantage of another who is sufficiently protected when he has received full indemnity for all the injury he has suffered. When such a one has been injured in but a single subordinate particular of his contract, he

should not, for that reason, reap all the other benefits of it, without any compensation. Nor could any punishment be more capricious than that which would thus be inflicted upon the wrongdoer. It would be the same whether his wrongful conduct related to a great or small amount. Indeed, the smaller his fault, proportionately the larger would be his punishment, as he would thus lose the benefit of more that had been honestly and faithfully done by him. No matter how small the fraudulent promise made and not performed, if it were still appreciable as an inducement to the contract, it would cause him to forfeit the whole value he had expended, even if it amounted to many thousands of dollars. The case at bar itself affords a sufficient illustration of how harshly the rule would work which would permit an entire contract, involving many particulars, to be rescinded because in some detail it was fraudulently unperformed.

The defendant was to furnish or raise money to procure the incorporation of the Harmonic Telegraph system with the Postal Telegraph Company; he was to furnish or procure the money for the purchase of the Ansonia wire factory; and was to build, or cause to be built, a line, according to the Postal Telegraph system, to Chicago. All this involved large sums of money and great exertions, but he has failed to purchase the thirty-two bonds of the plaintiff at fifty per cent, and to lend the plaintiff $20,000, according to the verdict of the jury, in fraudulent violation of his contract. For this failure, involving at its outside limit (if the loan was never repaid, and the bonds were utterly worthless) $36,000, the rule for which the plaintiff contends requires that the defendant should forfeit for the benefit of the plaintiff the one hundred and fifty bonds given in consideration of all the defendant was to do; which bonds the jury have estimated in value at over $100,000. According to this rule, the result would also be the same, and the defendant would alike forfeit the whole, if he had agreed to purchase a single bond for $500, or any other substantial sum, if such agreement had been an inducement to the contract. This is to allow a defrauded party to recover far more than the amount of any injury that can possibly have been inflicted upon him, and is not consistent with justice.

We are of opinion, therefore, that the learned judge erred in instructing the jury, that, if they were satisfied that " unless the defendant had promised to buy the thirty-two bonds at $500 a bond, and lend him $20,000, he would not have given him the bonds, this promise being made fraudulently, the defendant intending not to keep it, the plaintiff would be entitled to recover, notwithstanding the other considerations which had been fully and honestly performed combined with this to induce him to give the bonds." The defendant was entitled to an instruction in substance, that, if several distinct considerations entered into the contract to induce the plaintiff to part with the bonds, and three of these had been fully and honestly performed by the loans and advances made by the defendant, the plaintiff could not rescind the contract and maintain an action for the full value of the bonds, unless upon repayment of the sums which the defendant had lent or advanced; and further, that if it was impossible from the nature of the transactions to restore the defendant to the condition in which he was before the contract, the plaintiff could not avail himself of the benefit of the loans, advances, services, and other acts, rendered either to himself or to the company for whom he acted, and at the same time rescind the contract and recover back the consideration for these loans, advances, and services, but must seek his remedy in damages for the injury he had sustained by the wrongful and fraudulent failure of the defendant to perform the contract for the loan and purchase, which was the fourth consideration.

For the reasons already given, the exceptions to the ruling and refusals to rule in regard to this matter must be sustained.

The defendant has strongly urged that the finding of the jury that he ever made any promise to make the alleged loan or purchase of bonds was not justified by the evidence offered, which has been reported. As we have assumed that the jury might rightfully have found that he did make such promise, and have further held that, even if this was the case, he was entitled substantially to the ruling requested by him, it is not necessary now to consider this inquiry. Whatever form the litigation on this subject may hereafter take, it is more than probable that the evidence at a subsequent trial will vary in a greater or less degree from that which is now before us. It would not be

profitable, therefore, to discuss it in its present aspect, and might embarrass any subsequent examination of the facts.

The same remarks are applicable to the position taken by the defendant, that the plaintiff, with full knowledge that the defendant entirely repudiated any agreement for a loan or a purchase of bonds, still went on with the contract, and continued to receive benefit from subsequent services and advances of the defendant; and to the further position, that the plaintiff has, for a sufficient consideration, released any claim for damages by reason thereof to the defendant.

Other exceptions were taken to the rulings of the learned judge. Some of them naturally grow out of the theory upon which the case was tried, which we have held to be erroneous. None of them require present discussion.

*Exceptions sustained.*

*R. G. Ingersoll* (of New York) & *J. M. Morton,* (*H. M. Knowlton* with them,) for the defendant.

*G. O. Shattuck* & *H. P. Harriman,* (*W. A. Munroe* with them,) for the plaintiff.