Wyss, Respondent, vs. GRUNERT and others, Appellants.

*October 13—October 30, 1900.*

*Appeal: Review of findings: Joint tort-feasors: Rescission of contract: Restoration to previous condition.*

1. The findings of a referee on controverted questions of fact, confirmed by the court having original jurisdiction over the matter, cannot be disturbed on appeal unless they are against the clear preponderance of the evidence, indicating that it was not properly considered through mistake in overlooking material parts thereof or from prejudice or some other cause.

2. Where several persons are sued as jointly liable for a tort, the failure to hold one or more of them will not militate against the liability of those who are guilty.

3. The doctrine that before a person can rescind a contract for fraud he must restore the wrongdoer to his previous position, does not require the restoration to such wrongdoer of things which are of no value whatever, or the restoration to a third person of things received from him. It does not extend to *res inter alios acta.*

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Green county: B. F. DUNWIDDIE, Circuit Judge. *Affirmed as to one defendant; reversed as to the others.*

Action for damages for deceit. It is claimed in the complaint, in substance, that February 20, 1896, the Citizens' Bank of Monroe, Wisconsin, being the owner of a $2,000

note payable to its order, signed by plaintiff as accommodation maker with and for defendants *Speich* and *Marty*, received payment thereof from defendant *Grunert* and delivered the paper to him accordingly; that thereafter defendant *Grunert* caused such paper to be placed in the First National Bank of Monroe for collection and plaintiff to be notified thereof; that, believing the note was still an outstanding obligation against him as represented, plaintiff paid the same September 18, 1896, the amount of the payment being $2,147. Judgment was prayed for accordingly.

The answer of defendants was to the effect that *Grunert* did not pay the note but purchased the same and held it as an outstanding obligation against all the makers thereof until it was taken up by plaintiff as stated in his complaint.

The cause was tried by a referee, who found the facts to be, in substance, as follows: August 31, 1895, plaintiff, at the request and for the accommodation of defendants *Speich* and *Marty*, joined with them in making a $2,000 note to the Citizens' Bank of Monroe, Wisconsin, on which the interested makers obtained the face thereof. February 20, 1896, defendant *Grunert*, who had extensive business dealings with *Speich* and *Marty*, at their request and on their account, paid the note to the bank, charging the amount thereof to them in his book account with them. About September 18, 1896, *Grunert* demanded payment of the note from plaintiff, who, believing it was still an outstanding obligation against him as represented by *Grunert*, paid the same, the amount of the payment being $2,147. No part of said sum has been made good to plaintiff except $300 paid by *Speich* and *Marty*. After plaintiff took up the note as aforesaid, *Speich* deeded to him a cheese factory lot claimed to be worth $250, but without any request from plaintiff.

On such facts the court rendered judgment in plaintiff's favor for $1,847 and interest from the time he paid the note to *Grunert*.

For the appellants there was a brief by *P. J. Clawson* and *A. S. Douglas*, and oral argument by *Mr. Clawson*, *Mr. Wm. Smith*, and *Mr. James Lane Allen*.

For the respondent there was a brief by *Colin W. Wright*, attorney, and *Fethers, Jeffris & Mouat*, of counsel, and oral argument by *M. G. Jeffris*.

MARSHALL, J.   Did *Grunert* pay the note to the Citizens' National Bank? An affirmative answer to that will conclude *Grunert* on this appeal. A negative answer will require a reversal as to all the defendants.

It appears that *Speich* and *Marty* operated several cheese factories during the time covered by the transaction stated in the findings, and that *Grunert* handled their products and was largely their financial agent. The Citizens' Bank, desiring payment of the *Wyss* note, Durst, the cashier of the bank, suggested to *Grunert* to take it up because of his business relations with *Speich* and *Marty*. That resulted in *Grunert* paying to the bank the amount of the note and taking the paper into his possession. The direct evidence of what occurred at that time was given by *Grunert*, Durst, and Hodges, the assistant cashier of the bank. *Grunert* testified, in substance, as follows: 'I was security for a large amount for *Speich* and *Marty*. I had signed for $5,000 for them at the bank. Durst called on me several times to get *Speich* and *Marty* to reduce their indebtedness to the bank. I agreed to buy the $2,000 note on condition that my indebtedness could run. I dealt with Hodges when the note was taken up. I directed Hodges not to stamp the note paid, as I wanted to keep it. I said I wanted it understood that I was buying the note.' *Grunert* further testified as to the subsequent transactions with the note: 'After I purchased the note and before it was finally paid, I sold it to the First National Bank and afterwards took it back. While the note was in the First National Bank, *Wyss* was

notified to pay it, and thereupon Durst called upon me say-
ing he thought *Speich* and *Marty* paid it long before, but,
if such was not the case, if I would return the paper to the
Citizens' Bank *Wyss* would pay it. I followed that sugges-
tion and received my pay from Durst.'

Durst testified that when *Grunert* obtained the note there
was no talk about extending time on his paper as a consid-
eration for taking up such note; that there was no offer to
sell the paper, nor intention to do so. But he further testi-
fied that he took no part in the actual deal between the
bank and *Grunert;* that it was conducted on the part of the
bank by Hodges. Hodges testified as follows: "I do not
remember exactly what was said when the note was trans-
ferred to *Grunert*. He indicated that he wanted the note
paid, referring to it as the ' *Wyss* note,' and I got it out of
the case and computed the interest. I do not know as there
was anything said in respect to the matter. I started to
stamp the note paid. He indicated that he did not wish
it stamped, and then I delivered it to him. The note was
paid as far as our understanding went. We got our money
on the note. According to my recollection *Grunert* did not
propose to buy the note, and there was no proposition on
the part of the bank to sell it. He did not ask or give any
intimation that he wanted to buy the note."

The following circumstances corroborate what Hodges
and Durst said was their understanding of the transaction:
The paper was turned over to *Grunert* without indorsement
though it was payable to the order of the bank. *Grunert*
charged the money paid for the note to *Speich* and *Marty*
in his account with them, though he kept a bills receivable
account on his books. He rendered a statement of the book
account to *Speich* and *Marty*, indicating that they were
charged with the money paid for the note. He did not
notify *Wyss* of his ownership of the paper till about seven
months after he obtained it, and not until the financial condi-

tion of *Speich* and *Marty* became such as to lead him to believe that he could not collect it of them. The following circumstances corroborate *Grunert's* testimony: When the note was delivered to him, by his direction it was not stamped as is the usual custom when paper is actually paid over a bank counter. *Grunert* sold and indorsed the paper to the First National Bank of Monroe some six months or more after he obtained it. The memorandum on the stub of the check used in paying the money to the bank was to the effect that it was paid on a purchase of the paper. After *Wyss* paid the note he pressed *Speich* and *Marty* to reimburse him, and they made no claim that it had been paid by *Grunert*. *Speich* and *Marty*, in order to pay their outstanding indebtedness to the patrons of the cheese factories, avoid making an assignment, and satisfy *Wyss*, arranged with such patrons for a reduced price for milk so as to increase the profits of the business, and turned the factories over to *Wyss*, conveying to him at the same time some manufactured products on hand and all the tools in and for use in the business, valued in the bill of sale at $830. They also delivered to *Wyss* at the same time notes aggregating $1,000, and *Speich* gave a deed of a cheese factory lot valued at $250. There are a number of other circumstances but they are not of sufficient significance to materially add to the evidence before referred to.

The circumstance of the note being turned over without indorsement is without any reasonable explanation that can readily be suggested consistent with the theory that it was sold. On the other hand, the fact that the paper was not stamped paid is quite as persuasive in favor of the theory that it was purchased. The only explanation of the circumstance that the amount paid by *Grunert* for the note was charged by him to *Speich* and *Marty* as money due on account and billed to them as such in a statement subsequently rendered to them, is that they wanted such a statement so

as to exhibit their condition as regards their entire indebt-
edness to *Grunert*, and that subsequently the note was taken
out of the account and placed in bills receivable, where it.
in fact belonged. The circumstance that *Grunert* kept the
note in his possession instead of delivering it to *Speich* and
*Marty* is consistent with the theory of a purchase; but the
circumstance that the paper was held for months without
any intimation to *Wyss* that it had not been paid, indicates.
that *Grunert* intended, in taking it from the bank, to pay
it, and that his claim made a long time thereafter on *Wyss*
was a subterfuge to prevent his losing on account of opera-
tions with *Speich* and *Marty*. The circumstance that Durst
called on *Grunert* for the note as the agent of *Wyss*, when
the latter was requested to pay it, is explained by the fact
that he then stated that he supposed the paper had long
since been paid. That is consistent with his testimony that
he had no definite recollection of the circumstances of the
note leaving the bank, but supposed *Grunert* took it up by
paying it. The circumstance that *Speich* and *Marty* made
no claim that the note had been extinguished by *Grunert*,.
when pressed by *Wyss*, is consistent with *Grunert's* claim,
since they had received a statement from *Grunert* in which
the note was charged to them as an outstanding obligation.
There is reason for saying they honestly and reasonably be-
lieved they were liable upon the note. Again,* it was not
very material to them whether the debt was due to *Wyss* or
*Grunert*. It is not improbable that they then preferred to
deal with *Wyss* rather than *Grunert*, hoping to get him to take
the factory business off their hands or aid them in continu-
ing it. The circumstance of the sale of the note by *Grunert*
to the First National Bank of Monroe, of itself, has very
little significance. Such as there is creates suspicion of *Gru-
nert's* claim of ownership of the paper. It is not infrequent.
that a person reaches another with a demand against him
that is subject to question, through a third person as owner.

*Grunert* evidently desired to dispose of the note to the bank, or to have the bank appear to be the owner, and to reach *Wyss* with a demand for its payment in that way instead of performing the rather unpleasant task himself of presenting it to *Wyss* for such payment.

The above review of the evidence and conclusions disclosed thereby sufficiently shows that it cannot be said that the finding of the referee is clearly against the preponderance thereof. When there is a clear conflict of evidence and of the reasonable inferences therefrom, so much depends upon the appearances of witnesses, their manner on the stand, and the personal study of them during the trial which the careful trier will give in order to accurately weigh the evidence, that it is not safe to disturb his findings except in a clear case. There is a wide difference between preponderance of evidence on one side of a controversy and clear preponderance on the other. So, when the trial judge or referee, with the peculiar advantages of his position, decides as to where the truth lies on a controverted question of fact, it is not often that such decision is disturbed. In order to justify such disturbance, the evidence must not only preponderate against the finding, but the overbalancing that way must be sufficiently significant to produce conviction that the evidence did not receive proper consideration by the trial court, through mistake in overlooking material portions thereof or from prejudice or some other cause. That is plainly requisite to fully satisfy the rule as laid down in the books and supported by the adjudged cases, that the findings of a referee, confirmed by the court below, will not be disturbed unless against the clear preponderance of the evidence, which rule is the test to be applied to a referee's findings according to the decision of this court. *Zoesch v. Thielman*, 105 Wis. 117.

The test above indicated plainly precludes disturbing the findings of fact on the subject of whether the note was pur-

chased of or paid to the Citizens' Bank. The direct evidence is clearly in conflict. There are significant circumstances established that point both ways, some of which, on both sides, are susceptible of reasonable explanation, and some are not. Even if we were to weigh the probabilities in order to arrive at a conclusion, it is not clear upon which side the preponderance would be. The strongest circumstance in appellant's favor is the fact that he took the note, accompanying the act with a declination to having it canceled. That, without corroboration, is not enough to warrant finding that the transaction was a sale. A sale requires a precedent executory contract, one party agreeing to sell and the other to buy. The consummation of the contract requires a transfer of the title of the subject of sale with intent to execute it. Where there is a mere taking up of a note by a stranger, it being delivered uncanceled, by request, without any other circumstance, the presumption of law is that a payment of the note was intended and that the note is thereby extinguished. 2 Edwards, Bills & N. § 728; *Lancey v. Clark,* 64 N. Y. 209; *Binford v. Adams,* 104 Ind. 41; *Dougherty v. Deeney,* 45 Iowa, 443; *Swope v. Leffingwell,* 72 Mo. 348.

As to appellants *Speich* and *Marty* we are unable to discover anything in the facts found by the referee to support the judgment. The most respondent claims the evidence shows is that they failed to notify *Wyss* that the note had been paid when he pressed them for payment thereof and that they thereby aided *Grunert* in carrying out his scheme of saving himself harmless from loss by treating the paper as an outstanding obligation against *Wyss.* The trouble with that is, there is no finding to that effect, and the evidence by no means clearly establishes the claim that when *Wyss* called upon *Speich* and *Marty* for payment they knew the note was not in existence as a legal obligation. *Grunert* on one occasion gave proof to them that the money due him

was on account and not on the note, and upon another oc-casion that he held the note as an outstanding obligation. It had never been delivered to them and they may well have understood that *Grunert* understood that the paper had not been extinguished.   It is one thing to sustain the finding of a referee confirmed by the court below; it is quite another to make a finding in this court from evidence found in the record.   The latter requires clear and convincing proof. Mere evidence from which a finding might reasonably have been made is not sufficient.   While we have passed on the question of whether the evidence connected *Speich* and *Marty* with the wrong to plaintiff, the complaint is as bar-ren as the findings of fact and the evidence of any sugges-tion that they were guilty participants in the wrong.   There is no cause of action stated or even attempted to be stated against them in the complaint so far as we can discover.

The failure to hold two of the defendants liable to plaintiff does not of itself militate against holding *Grunert*.   If the theory of the complaint were that there was a fraudulent agreement between the three appellants executed to plaint-iff's damage, it would show a several as well as a joint lia-bility.  The concert of action would be material only in order to show a joint liability rendering all severally liable also for the result of the wrong, without regard to the relative ben-efit they obtained. *Fountain Spring P. Co. v. Roberts*, 92 Wis. 345.   The wrong to plaintiff was remediable by an action for deceit whether it was committed by one of the parties acting alone or by all of them acting in concert.   So the failure to hold *Speich* and *Marty* is of little significance on the question of whether *Grunert* is liable.

It is said this action was not maintainable because the evidence shows respondent received full reparation from *Speich* and *Marty* for any wrong done him; that he collected of them the full amount of the payment made to *Grunert*. We do not deem it necessary to discuss at length the evi-

dence upon which that contention is based. Looking at it in the most favorable light for appellants, there was considerable property turned over to respondent to secure him in part against loss from having paid the note. We fail to find any evidence showing, or definitely tending to show, that respondent received anything mitigating his damages for the wrong complained of, except $300 allowed by the referee for a note turned over to him by appellants *Speich* and *Marty*. If the conveyance of property to *Wyss* had anything to do with the claim against *Grunert* or the claim against *Speich* and *Marty*, on account of the $2,000 note — and we are inclined to think it had as to the latter, though that is in dispute — it was by way of mere security, not payment, and nothing has been realized except as indicated. So respondent's damage, at the time' of the commencement of the action, was the amount paid *Grunert*, less $300, the amount awarded him by the judgment.

A further point is made that this action is not maintainable without restoring defendants to their former situation. How such failure would affect *Speich* and *Marty*, if the facts showed they were otherwise liable, need not be discussed. As to *Grunert*, the rule invoked has no application, because respondent received nothing of value from him. Having received nothing of value, there was nothing to be returned as a condition precedent to the commencement of the action. *City Nat. Bank v. Kusworm*, 88 Wis. 188; *Higham v. Harris*, 108 Ind. 246; *Snow v. Alley*, 144 Mass. 546, 554. The doctrine that a person cannot rescind a contract or sue for money or property parted with thereon, on the ground of fraud, without returning to his adversary what he himself received on it, refers to the relations between the parties to the contract, not to the rights of strangers thereto. As said in *Gay v. D. M. Osborne & Co.* 102 Wis. 641, rules of law are supposed to be consistent with reason and com-

mon sense when applied to the rescission of a contract upon the ground of fraud the same as to any other subject. The right of rescission, though legal, is based on equitable principles, therefore the requisites of its exercise should go no further than strict compliance with the dictates of good conscience requires. For what reason should respondent return to *Speich* and *Marty* the security he holds from them, if any, as a consideration for recovering from *Grunert?* Where does *Grunert's* equity come in as to that in excess of the actual amount *Wyss* has recouped from *Speich* and *Marty?* The answer must be that there is no such equity. The things of value received on a contract to be returned as a condition precedent to rescission, are those received of the wrongdoer. He has no right, legal or equitable, to anything received of a third person, except as the damages inflicted by him are thereby reduced. Many illustrations of this doctrine, touching the circumstances of this case on the branch here under discussion at all points, might be given. In *Stevens v. Austin*, 1 Met. 557, B. received a note from A. for goods fraudulently obtained of him. A. conveyed the goods to C., who took with knowledge of the fraud. *Held*, that B. could recover of C. without returning the note to A. SHAW, C. J., in delivering the opinion of the court, said: "The question is, whether the plaintiff was bound to tender back the note and money he had received, before he could bring his action. We think he was not. Not to the defendant; for the plaintiff had received nothing from him. Nor could the defendant raise the question of whether the plaintiff had made restoration to A. or not. It was *res inter alios*, with which the defendant had no concern, and was wholly irrelative to the issue between the parties." To the same effect are *Snow v. Alley*, 144 Mass. 546; *Thayer v. Turner*, 8 Met. 550.

What has been said covers all questions presented on the

appeal.　As to appellant *Grunert* it requires an affirmance of the judgment, but as to appellants *Speich* and *Marty* the judgment must be reversed.

*By the Court.*— The judgment appealed from is reversed as to *Speich* and *Marty* and affirmed as to *Grunert*, costs in this court to go against respondent for clerk's fees and printing.　The cause is remanded with directions to modify the judgment in the circuit court accordingly, dismissing the case as to *Speich* and *Marty*, with costs.