## SWOPE v. LEFFINGWELL et al., Appellants.

**Promissory Note**: EFFECT OF A STRANGER TAKING UP A NOTE. If one not a party to nor liable upon a note takes it up with his own money, the transaction will be deemed a purchase. and not a payment, if such was the intention of the parties; and this is the rule, whatever may have been the mode adopted of accomplishing the result.

In this case one H., who had assumed to pay certain notes secured by a deed of trust on real estate, in order to prevent a foreclosure, procured a bank to take up the notes. The arrangement was that the bank should take the note of one B. with the real estate notes as collateral security. B. accordingly executed his note and sent it to the bank. The holder of the real estate notes also sent them to the bank accompanied by a draft on H. for the amount due upon them. The bank paid the amount, and took the notes; *Held*, that the transaction amounted to a purchase and not to a payment.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*Noble & Orrick* for appellants.

We claim most confidently that the record discloses clearly, that the first note discounted by the Atlas Bank, was the note of Bowen alone, and was not indorsed by Honoré; that there was no loan to Honoré in fact, form or intention; and that neither the Atlas Bank nor Mr. Doane, its agent, had any notice that Honoré was under any personal liability to pay the Swope notes; and the bank did not, in fact, pay the Swope notes, but purchased them.

To constitute payment something valuable must be

delivered by the debtor to the creditor for the purpose of extinguishing the debt, and the creditor must receive it for same purpose. *Pacific Bank v. Mitchell,* 9 Met. 297; Byles on Bills, 175; *Burr v. Smith,* 21 Barb. 262; Chitty on Bills, 392; *Dodge v. Freedman's S. & T. Co.,* 93 U. S. 379; *Harbeck v. Vanderbilt,* 20 N. Y. 395; *Thompson v. Kellogg,* 23 Mo. 284; *Howard v. Jones,* 33 Mo. 583; *Appleton v. Kennon,* 19 Mo. 637.

There is another thread to be considered, that, at the time of these transactions, one of the Swope notes, involved, was not due. It was a note to the amount of some $11,000 or $12,000. It was negotiable paper, and passed before its maturity into the custody of the Atlas Bank for a valuable consideration. It was unaffected by any equities, and whatever conclusion, by any possibility, may be reached as to the two matured notes, cannot affect this one unmatured. The one note unmatured would be unaffected, for Honoré had made no agreement in fact with any one to pay it before maturity, and so no notice of any such agreement could possibly have come to the Atlas Bank. Moreover, the existence of this note thus unmatured is a most prominent fact to prove there was no payment or intended payment. It would have been indeed strange had Honoré, who was unable to meet two notes matured, intended not only to pay these but the third unmatured one also; and that the bank should have loaned him the money to do this, and he should have cleaned off so very promptly this land, upon which were resting subsequent mortgages securing his (Honoré's) own paper to the amount of some $36,000.

The security in the hands of the bank was available against the property, even if in form paid, under the circumstances of this case. *Wolff v. Walter,* 56 Mo. 292; *White v. Knapp,* 8 Paige 173; *Hoy v. Bramhall,* 19 N. J. Eq. 567; *Peltz v. Clark,* 3 Pet. 482.

*E. B. Sherzer* and *Glover & Shepley* for respondent.

If it be admitted that the insurance company intended a sale, still that would not make the transaction a sale; for it would be a sale to Honoré, a party bound to pay the note. It would be not a sale, but a legal satisfaction and -payment. The company, however, did not intend a sale, but a payment, as the letters and contemporaneous memoranda show. It knew that Honoré had assumed the payment of the Swope notes.

The notes were delivered to Honoré or to his use. They were attached to a draft drawn upon him as the debtor bound in law to pay them. The draft was in the full amount, of the notes which were attached to it. By paying the draft he became entitled to the notes. As soon as he paid the draft, which was the consideration represented by the notes, the notes vested in him. As soon as they vested in him, they were paid as to this plaintiff. He could not sue on them if he retained them. And certainly his assignee, with knowledge of payment, could not have any greater right than he had.

As soon as the consideration of the delivery of the notes was paid—that is, the draft, the title passed to Honoré and as against Swope it was extinguished. This was Swope's equity against Honoré and Honoré's transferee. *Schnake v. Kellogg*, 56 Mo. 136; 1 Daniel on Negot. Instr., 539; Story Promissory Notes, (6 Ed.) 205, 206; *McCabe v. Swap*, 14 Allen 188; *Strong v. Converse*, 8 Allen 559; *Brown v. Lapham*, 3 Cush. 554; *Putnam v. Collamore*, 120 Mass. 454; *Carlton v. Jackson*, 121 Mass. 592; *Russell v. Pistor*, 7 N. Y. 171; Smith's Merc. Law, 318; *Wolff v. Walter*, 56 Mo. 292.

The cashier of the Atlas Bank testifies that the Bowen-Honoré note was discounted, and the proceeds of discount took up or paid the draft. If this be true—and there can be no doubt thereof—then the money was loaned upon the Bowen-Honoré note, and the Swope notes were pledged by Honoré and Bowen as collateral security, after they had

been taken up by the proceeds of the discount. A discount, however, in banking "*ex vi termini*," imports and implies a loan. *Farmers' etc., Bank v. Baldwin*, 4 Cent. Law Jour. 119; *Niagara Co. Bank v. Baker*, 15 Ohio St. 69; *Fleckner v. Bank*, 8 Wheat. 338. And the fact that the notes were held as collaterals is itself conclusive of a loan. Who was the borrower? Certainly not the insurance company. Honoré and Bowen were the borrowers of the money paid on the discount.

The fact that the Swope notes were pledged as security of the Bowen-Honoré note, and were purchased at a sale under a power in a paper to which they were collateral, is conclusive of two things: 1st. That the Atlas Bank did not take title from the insurance company as purchaser. Its title is declared in the Bowen-Honoré note. The idea of a purchase by the bank from the insurance company, is excluded by the import of the Bowen-Honoré note discounted by them without respect to the question whether the Swope notes so pledged came from Bowen or from Honoré. In either case the bank is not a buyer. It is also conclusive of the fact that the title to the notes, whether pledged to the bank by Honoré or by Bowen, had to come from and through Honoré.

There is but one construction to be placed upon the testimony, as contained in the contemporaneous correspondence of the parties. Throughout, it speaks of payment, not sale.

The notes were acquired by the Atlas Bank as a pledge for a loan after two of them were due. They were, therefore, subject to the equities relating to them now claimed by plaintiff.

The question in this case also involves the equities relating to a mortgage. When the notes were pledged to the Atlas Bank, two of them were dishonored paper. The deed of trust was also a broken and dishonored security. There has been two advertisements under it.

Doane, agent of the bank, had knowledge of Honoré's

relation to the notes, as debtor, having assumed them Doane had knowledge of the equity to which the notes were subject, whether due or not due, and the bank is bound by this knowledge. The bank itself had knowledge of Honoré's relation to the notes as debtor.

HENRY, J.—On the 25th day of May, 1872, Logan O. Swope was the owner of block 24 of Peter Lindell's second addition to the city of St. Louis, incumbered by a deed of trust, by which said block was conveyed to Leffingwell to secure three promissory notes executed by said Swope to Robert C. Gordon, in the aggregate for the sum of $35,-839.95. Each of said notes was dated December 26th, 1871; one for $12,586.65, payable December 26th, 1872, one for $11,946.65, payable December 26th, 1873, and the other for $11,336.65, payable December 26th, 1874. On said 25th day of May, 1872, Swope sold and conveyed the said block to Henry H. Honoré for $80,000, subject to said trust deed to Leffingwell, and, by another agreement in writing of that date, Honoré obligated himself to Swope to pay off said notes secured by the deed of trust from Swope to Leffingwell. Honoré on the 27th day of May, 1872, executed a deed of trust to Ed. B. Sherzer, conveying said block to him in trust to secure two notes executed by said Honoré to Andrew McKinley, one for $10,040, the other for $4,000, dated 27th day of May, 1872, and payable three years after their date, and one for $3,000 to Logan O. Swope of same date, and payable three years after its date. This deed of trust from Honoré was, by its terms, subject to two prior deeds of trust made by Honoré, one to Edwin Sherzer, dated May 25th, 1872, to secure a note of that date for $18,500, payable to Swope, three years after its date; the other deed of same date to same trustee, to secure a note of that date for $11,500, payable to Andrew McKinley, one year after its date, who subsequently assigned it to C. T. Bowen.

The notes of Swope to Gordon, by assignment, be-

came the property of the St. Louis Life Insurance Company. When the first two became due the holder caused the property to be advertised for sale under the deed of trust, but Honoré interposed, and, by paying expenses and interest, induced the holder to suspend proceedings, that he might get some one to purchase the notes who would not force a sale of the property. Honoré then opened negotiations with John W. Doane, of Chicago, who was acting as agent of the Atlas National Bank, of Boston, in purchasing commercial and other paper. Doane at first declined to purchase the Swope notes, because he had instructions from the Atlas Bank to buy no paper running more than four months. It was finally arranged between them that Honoré was to get C. T. Bowen to execute his note for the aggregate amount of the Swope notes, payable three months after its date, for discount by the Atlas National Bank, and the Swope notes to be held by Doane as collateral security for its payment. This note of Bowen was dated in July, and fell due October 19th, 1874, before the maturity of the last of the three Swope notes. A. M. Britton; vice-president of the St. Louis Life Insurance Company, agreed with Honoré that the Swope notes and the deed of trust should be sent to New York with a view to the consummation of the arrangement with Doane, and through the National Bank of the State of Missouri the notes and deed of trust, with a draft on Honoré for the aggregate of the three notes, were sent to the Bank of Commerce, New York. The notes were indorsed "without recourse in law or equity, W. J. Lewis, President," as agreed by Britton and Honoré, and ordered by the executive committee of the board of directors of the life insurance company. Doane proceeded to New York with Bowen's note, having previously telegraphed the Atlas Bank to honor his draft for the aggregate amount of the notes, but on arriving in New York found that the Bank of Commerce had returned the notes, deed of trust and draft to the bank at St. Louis, and informed Honoré of the fact,

23—72

and subsequently, by request of Doane and Honoré, they were sent to the Atlas Bank, which remitted the amount to the bank at St. Louis. On the 25th day of June, 1875, Logan O. Swope caused the block in controversy to be sold under Honoré's deed of trust to Sherzer, to secure his note for part of the purchase money, and Swope purchased the property at the price of $22,000, and received a deed from Sherzer conveying the property to him. There were several renewals of the Bowen note to the Atlas Bank. Of the renewal notes, Bowen was maker and Honoré payee and indorser. After the last renewal note became due, the Atlas Bank took steps to have the property sold under the deed of trust, for the payment of the Bowen note, of which it had become the purchaser at a sale made by Doane, who held them as collaterals to secure the Bowen note with power to sell, etc.

This suit was instituted to enjoin and restrain said bank from proceeding with the sale of the block of land in controversy, alleging that the notes had all been paid. Swope obtained a decree in his favor in the circuit court, which, on appeal to the court of appeals, was affirmed, and defendants have prosecuted their appeal to this court.

The only question for consideration is, was the transaction between Honoré and Doane and the bank, a payment of the Swope notes? That it was the intention of Doane and Honoré that the former should purchase, and not pay off the notes, the evidence leaves no doubt. If Doane intended to pay off the notes, why his precaution to ascertain whether they were or not a first lien on the property? and why so solicitous for the opinion of Mr. Albert Todd in regard to the title to the block? All the circumstances show that it was his purpose, as agent, to make an investment for the Atlas Bank, and his positive testimony is, that he purchased the notes. That this was also what was contemplated by Honoré, is shown by his letters to the St. Louis Life Insurance Company, and his conversations

with its vice-president, and the final agreement that they should be indorsed by the company, without recourse, and sent to New York with a view to the consummation of the arrangement made by Honoré with Doane. The same evidence conclusively shows that this was the understanding of the insurance company, the owner of the notes. If sent to New York for collection, why did they take the precaution to indorse them without recourse? Why indorse them at all? or, if indorsed, why not for collection, if payment of notes was expected? It had sent the notes and the draft on Honoré with directions to deliver them up to the payor of the draft, whether Honoré, or another; and there was no necessity, if nothing but the payment of the notes was in view, for any indorsement of the notes whatever, even for collection. But Mr. Britton's testimony, uncontradicted, is positive, that the notes were sent thus indorsed, first to New York and then to the Atlas Bank at Boston, under the agreement made between Honoré and the insurance company, through Britton and its executive board. This being so, what is there to make the transaction a payment, instead of a transfer and sale, of the notes?

It is contended that the draft for the aggregate amount of the notes was drawn on Honoré, who was bound for their payment, and, therefore, the payment of the draft was a payment of the notes. The cashier of the Atlas Bank testifies that the draft was not paid, but that an amount corresponding to the amount of the draft was paid, which was the sum total of the notes. He is not contradicted, although the transaction upon its face bears a different construction. This, however, is well explained by the witness, briefly, in answer to the following interrogatory: "Don't you think that the cashier of the St. Louis Bank, or any other third party, on reading your letter, would interpret the words 'accept for larger amount,' to mean that you had paid the Honoré draft?" Answer.

"Knowing nothing about other transactions, I think he would."

But suppose it is treated as a payment of the Honoré draft, does that, in view of all the facts, constitute payment of the notes? It is contended that Doane and the Atlas Bank had knowledge that, as betwixt him and Swope, the Swope notes were Honoré's debt, and he was primarily liable to pay it, and that, therefore, the payment of the Honoré draft was a payment of the notes. Conceding, for the argument, that from these facts, that would be a legal conclusion, the facts are not established by the evidence. Doane testifies, that all he knew of that matter was, that Honoré's conveyance was taken subject to the encumbrance of the Swope notes. No witness testifies to the contrary. The conveyance, it is true, was subject to the encumbrance, and this was expressed in the deed, but that did not create a personal obligation on Honoré to pay those notes. This is well settled in this State, and we know of no text book or adjudged case, that holds otherwise. *Heim v. Vogel*, 69 Mo. 529; *Hoy v. Bramhall*, 19 N. J. Eq. 75.

The court of appeals, in its opinion, fell into an error in stating that the knowledge of his (Honoré's) position, with reference to these notes, was brought home to the bank, when with the deed of trust, containing the assumption of payment by Honoré of the Swope notes and the Honoré draft before him, the cashier sat down to fill up the blank in the Bowen-Honoré note with the description of the collaterals. The only deed then before the cashier was the deed of trust from Swope to Leffingwell, to secure the notes in question, and it contained no reference whatever to Honoré's obligation to pay them, because, at its date, there had been no transaction between Swope and Honoré. The deed from Swope to Honoré was not before him, nor had he or Doane, or any officer of the bank, ever seen it, and if they had, it contained, as we have seen, no stipulation binding Honoré, personally, to pay the Swope-Gordon notes, so that the only information Doane, or the

bank had, was that communicated to Doane by Honoré, that his deed was subject to the encumbrance.

Conceding then that the Honoré draft was paid, as is contended, does that, under the circumstances, amount to payment of the notes? It was the plan adopted by the insurance company and Honoré to effect a sale of the notes; Honoré did not raise the money to pay it. His name was not on the first Bowen note. This is the positive testimony of the cashier of the bank, and the facts, that the proceeds of the discount of that note were placed to the credit of Doane on the books of the bank, and the name of Honoré nowhere occurred on the books are strongly corroborative of his statement. It was a clumsy mode of accomplishing a very simple result; but the form is not to overshadow the substance. It was not a payment of the notes by Honoré, or any one for him, nor did either the holder of the notes, or Honoré, or Doane, or the bank, or any one connected with the transaction intend any such thing, or suppose that it had been done. Honoré's name in the draft is of no more significance, in the light thrown upon the transaction by all the antecedent circumstances, than if it had been drawn on John Doe or Richard Roe.

Considerable stress is laid upon letters written by Honoré to Britton, in one of which, July 21st 1874, he states that he "had made arrangements with a party to pay the Swope notes;" in another, July 29th, 1874, that he was surprised and annoyed by receipt of a telegram "saying these Swope notes had not been paid;" but in the letter of the 21st day of July he also says: "I had made arrangements with a party who left here for New York Sunday to pay the Swope notes, but have just received a telegram from him that the papers had all been returned to St. Louis. I have just telegraphed you as follows: 'Papers not in New York. Party who is to pay them gone to Boston, and wants them sent to Atlas National Bank, Boston. Please do so. Answer.'" Can there be any doubt that the reference in this letter is to Doane and the arrangement between

them, and that Mr. Britton well understood to what it referred? In pursuance of the understanding betwixt him and Honoré, and in compliance with the above telegram, he sent the papers to the Atlas Bank with the notes indorsed as we have seen. In Honoré's letter of the 29th day of July, he wrote: "Nearly two weeks ago I made arrangements with Mr. J. W. Doane, of this city, to take up the notes, but, when he arrived in New York, found that they had been returned to St. Louis, and sent me the following telegram: 'H. H. Honoré, etc. Papers have all been returned to St. Louis. Have them forwarded to Atlas National Bank, Boston, and I will carry out the contract.'" Again: "Mr. J. W. Doane is one of our largest grocers and a man of means and reliability, and he is also one of the largest buyers of securities we have, and his failure to take up the notes completely mystifies me. I still feel confident that Doane will take the paper." Evidently when he speaks of the "payment of the notes," or "taking them up," he does not mean payment of the notes, but payment of the amount to the insurance company under the arrangement with Doane for the sale of the notes.

It is alleged in the petition that Bowen was jointly concerned with Honoré in the purchase of the block, and as between them, was equally bound to pay the Swope notes, and for this reason, it is contended, he executed his note for discount at the Atlas Bank. There is not a particle of testimony to that effect; but on the contrary, Bowen testifies positively, that he had no interest whatever in that purchase, and that he executed that note in order to prevent a sale of the premises under the Swope deed of trust, to the sacrifice of his lien for the note assigned to him by McKinley. We think the conclusion, from all the facts of this case, irresistible, that it was not in the contemplation of Honoré, or Doane, or Bowen, or the bank, or the insurance company, the holder, that the notes were paid, or to be paid, by the transaction betwixt them.

The authorities are all to the effect that "if money be

paid, not by one who is a party to a judgment and liable upon it, but by some third person, the judgment will be extinguished or not according to the intention of the party paying it." This was the language of Selden, J., in *Harbeck v. Vanderbilt*, 20 N. Y. 398. In that case there was a judgment against Jacob Vanderbilt, and Harbeck and five others. An execution having been issued to the sheriff of Richmond county, in which Jacob Vanderbilt had abundant property to satisfy it, he, through his attorney, paid to plaintiffs in the execution his *aliquot* share, one-seventh, and for the remainder, delivered to the plaintiff in the judgment his promissory note, payable four months after date, to the order of and indorsed by Cornelius Vanderbilt, and simultaneously the attorney took to himself an assignment of the judgment to be held by him as an indemnity to Cornelius Vanderbilt against his liability as indorser of the note, and the execution was then withdrawn. Before the note became due Cornelius Vanderbilt had another execution issued to the sheriff of New York, who was proceeding to enforce its collection from the property of other of the defendants, who instituted suit to enjoin and restrain the sheriff, etc., alleging that the judgment had been satisfied. The trial court so held, but the court of appeals reversed the judgment. Opinions were delivered by Gray and Selden, JJ. The former observed that: " Every judgment purchased and paid for, is so far as the plaintiffs in it are concerned, paid; but if at the time of payment an assignment is made by the plaintiffs to a third party for the benefit of one with whose money or credit the payment is made, the judgment, although in one sense paid, is not satisfied, but remains subsisting and valid, until it has answered the purpose for which it was assigned." Jacob Vanderbilt was personally bound for the full amount of the judgment. This was known to the plaintiffs who obtained it. He paid one-seventh of the amount in cash, and gave his note payable to the order of Cornelius Vanderbilt for the balance, which was accepted by the plaint-

iffs, and the execution was withdrawn, and the judgment assigned to the attorney for the benefit of C. Vanderbilt. So far as the plaintiffs in that judgment were concerned, it was paid by Jacob Vanderbilt, who was primarily liable as maker of the note, and a defendant in the execution. Suppose, instead, the arrangement had been that the plaintiffs in that judgment should draw on Jacob for the amount, to be paid by Cornelius Vanderbilt, who was thus, for his security, to have an assignment of the judgment, would not this transaction have been the same in substance? Instead of paying a draft on Jacob, he indorsed a note executed by him, and in that way became liable to pay the amount of that judgment. In equity, form yields to substance. The shadow follows the body, not body the shadow, and if equity would, on the facts of this case, permit Logan O. Swope to purchase this property, worth nearly $100,000 for less than one-forth of its value, having previously received at least $10,000 on the sale to Honoré, and hold it discharged of the lien in question, it would work an injustice seldom, if ever, resulting from an application of the inflexible rules of the common law.

The case of *White v. Knapp*, 8 Paige Ch. 175, we regard as directly in point. Hinkley had executed a mortgage to a bank on property, which he afterward conveyed to Knapp, to whom he obliged himself to pay the incumbrance. Knapp subsequently executed a mortgage to White of the same property for $1,413.27. In June, 1836, the bank demanded of Hinkley the balance due on his mortgage, and not having the money, he induced the son of the defendant, Thomas, to let him have $380 of his father's money to pay off said mortgage, promising that Thomas' father should have the same security for the money that the bank then had, which arrangement the father, when informed of it, sanctioned. Hinkley, the debtor, then went to the bank with the money thus obtained, together with a further sum of his own, and took from the bank an assignment of the bond and mortgage to Thomas, to whom

they were afterward delivered. The Chancellor, Walworth, said : " Upon the facts presented in this case, I should have no doubt that the defendant, Thomas, was entitled to hold the bond and mortgage as security for the money thus advanced by his son, with the interest thereon, even if the subsequent mortgage by Knapp to the complainant had been given for money advanced at the time and not merely to secure an antecedent debt."

Two respectable courts having decided this cause against the defendants, we have given it the consideration, which that fact, and the amount and principle involved, demanded, and been forced by the evidence, to the conclusion that the Atlas Bank has, both in law and equity, a right to the lien it claims upon the property in question, and that the judgment should be reversed and the bill dismissed, and, all concurring, it is so adjudged and ordered.

### On Motion for Rehearing.

HENRY, J.—In the view we take of this case, it does not matter whether Honoré, by stipulation in the deed from Swope to him, assumed the payment of the notes in question or not. The authorities cited in the opinion fully sustain the position, that if the parties to the transaction intended a purchase, and not a payment, of the notes, it did not amount to a payment, although Honoré was personally liable to pay them, and the other parties were aware of that fact. That purchase, and not payment, was in the contemplation of all the parties, we still think clearly established by the evidence. Whether the trust property is worth more or less than this court found from the evidence, is of no consequence, because the right of the Atlas Bank to resort to the deed of trust, executed by Swope, for satisfaction of the notes, is the same whether the property is worth $100,000 or only $10,000. Counsel allege that three contradictory statements, as deductions from the

testimony, occur in the opinion delivered, viz : First, That Doane purchased the notes of the insurance company. Second, That Doane held them as collateral to his own debt or note. Third, That Doane held them as collateral to secure the Bowen note. The first statement is not to be found in the opinion; and, while the second does occur, the contest clearly shows that, by a clerical mistake, the name of " Bowen " was written, when that of Doane was intended, and it is surprising that counsel gravely urge such a mistake as a reason why a new hearing should be granted.

With regard to the right of the Atlas Bank, under the National Banking Act, to buy this paper, it is only necessary to say that the judgment of this court, in the case of *Matthews v. Skinker*, 62 Mo. 329, holding that a national bank could not deal in such securities, or avail itself of the deed of trust executed to secure them, was reversed by the Supreme Court of the United States, and we may add, that *Matthews v. Skinker* was overruled by this court before the judgment was reversed by the Supreme Court of the United States. *Thornton v. The National Exchange Bank*, 71 Mo. 221.

Nothing has been alleged which raises a doubt in our minds, that the opinion heretofore delivered is in accord with well established principles of equity, or that our conclusions were not warranted by the evidence. The motion is overruled. All concur.