RICHARDSON, by STRODE, Curator, Respondent, v. MISSOURI FIRE BRICK COMPANY, Appellant.

**St. Louis Court of Appeals, February 5, 1907.**

1. **NEW TRIAL: Discretion of Trial Court: Inadequate Verdict.** Appellate courts will reverse the action of trial courts in granting new trials in suits for damages, whenever it appears that the discretion of the trial court was arbitrarily and unreasonably exercised. But, though the court may be satisfied that the damages awarded are excessive or inadequate, it will not on motion for new trial interfere with the finding unless the verdict is so extravagant as to bear evident marks of prejudice, passion or corruption.

2. ———: ———: **Excessive Verdict: Damages.** In an action by a boy eleven years of age for damages on account of injury to his arm, where it was shown that the arm was broken at the elbow joint and permanently injured so that plaintiff would never be able to extend his arm to its full length or use his arm in a manner requiring strength in the elbow, a verdict for $500 was so grossly inadequate that the trial court in setting aside a verdict for that amount did not abuse its discreton, but properly exercised it.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney,* Judge.

Richardson v. Missouri Fire Brick Co.

AFFIRMED.

*Jamison & Thomas* for appellant.

(1) To warrant interference, on the ground of excessiveness or inadequacy, with the verdict of the jury in a case of damages, the verdict must be so excessive or inadequate as to indicate prejudice, passion or mistake. Goetz v. Ambs, 27 Mo. 28; Kennedy v. Railway, 36 Mo. 351; Whalen v. Railroad, 60 Mo. 323; Walker v. Railroad, 87 Mo. 37; Cochran v. Railroad, 131 Mo. 607; Boyd v. Westinghouse, 132 Mo. 579; Merrill v. City, 12 Mo. App. 466; Hemelrich v. Garlos, 24 Mo. App. 264; Brown v. Railway, 51 Mo. App. 192. (2) Cases wherein damages were held to be inadequate: Donovan v. Gay, 97 Mo. 440; Choquette v. Railway, 152 Mo. 257; Welch v. McAllister, 13 Mo. App. 89. (3) Cases wherein damages were held not to be inadequate: Pritchard v. Hewitt, 91 Mo. 547; Bogges v. Railroad, 118 Mo. 328; Leahy v. Davis, 121 Mo. 227; Dowd v. Westinghouse, 132 Mo. 579. (4) Appellate court will reverse action of trial court in granting new trial of suit for damages, where the new trial is ordered under the erroneous view that damages allowed by the jury were inadequate. Lee v. Knapp, 173 Mo. 385; Edwards v. Railway, 82 Mo. App. 478; Yates v. Shanklin, 85 Mo. App. 358.

*A. R. Taylor* and *Morris Tucker* for respondent.

STATEMENT.—At the age of eleven years, plaintiff having neither father nor mother living, entered the service of defendant (a corporation) under a contract, whereby he was to receive fifty cents per day for his labor. One of the duties assigned plaintiff was to close the windows of defendant's four-story factory building on every workday, between the hours of five and six o'clock p. m. An unguarded belt, attached to a wheel

or pulley, was operated through an opening in the floor of the fourth story of the factory. This opening was within about two feet of one of the windows which it was plaintiff's duty to close, and the floor was greasy and slippery, and covered with fine particles of clay and brick dust. Within a few minutes of six o'clock p. m., on September 7, 1904, plaintiff went to the fourth floor of the factory for the purpose of closing the windows. He closed the window in close proximity to the belt, and turned to go down to the floor below. As he turned, his foot slipped and slid into the opening through which the belt was operated, and he was carried up four or five feet by the belt and dropped to the floor, causing a fracture of his right arm about an inch above the elbow. The action was to recover the consequential damages, laid at fifteen thousand dollars. The trial resulted in a verdict in plaintiff's favor for five hundred dollars. Plaintiff moved the court to set aside the verdict and grant a new trial for the following reasons:

"First. That the verdict is grossly inadequate.

"Second. That the verdict is so inadequate as to indicate that it was the result of passion, prejudice or mistake on the part of the jury.

"Third. That the verdict is against the weight of the evidence as to the damage sustained by plaintiff."

The motion was taken up and, after considering the same, the court made the following order:

"The motion of the plaintiff for a new trial, having been submitted to the court and duly and fully considered, it is now ordered and adjudged by the court that said motion be and that same is hereby sustained on the grounds stated in said motion; i. e.,

" '1. That the verdict is grossly inadequate.

" '2. That the verdict is so inadequate as to indicate that it was the result of passion, prejudice or mistake on the part of the jury.

" '3. That the verdict is against the weight of the

evidence as to the damages sustained by the plaintiff,' and which is accordingly ordered and adjudged, by the court, that the judgment heretofore entered herein on the fifth day of December, 1905, be and the same is hereby set aside and vacated and that a new trial be and hereby is granted herein, to which order and judgment in sustaining said motion for a new trial the defendant duly excepted at the time."

Defendant appealed from this order.

BLAND, P. J. (after stating the facts).—1. Appellate courts will reverse the action of trial courts in granting new trials in suits for damages whenever it satisfactorily appears the discretion of the trial court was arbitrarily and unreasonably exercised. [Whitsett v. Ransom, 72 Mo. 358; Chouquette v. Railway, 152 Mo. 257, 53 S. W. 897.]

In Goetz v. Ambs, 27 Mo. l. c. 34, in respect to the granting of new trials, on account of the awarding of excessive or inadequate damages by the jury, in actions of tort, the court said: "The general rule on this subject is well stated by Mr. Sedgwick, in his work on Damages (p. 466): 'That, although the courts are entirely satisfied that the damages are excessive and altogether beyond a compensation for the actual loss sustained, they will not, on motion for a new trial, interfere with the finding unless the verdict is so extravagant as to bear evident marks of prejudice, passion or corruption.'" This general rule has been adhered to by the appellate courts of this State. [Dowd v. Air Brake Co., 132 Mo. l. c. 582, 34 S. W. 493, and cases cited.] It is also the rule in this State, that the appellate courts possess the power to order a remittitur when the verdict is excessive. [Chitty v. Railway, 166 Mo. 435, 65 S. W. 959; Broyhill v. Norton, 175 Mo. 190, 74 S. W. 1024; Barnes v. Lead Co., 107 Mo. App. l. c. 614, 82 S. W. 203.] To a much greater degree is the trial court possessed of

this power, and the power to set aside inadequate verdicts.

2. In Chouquette v. Railway, supra, it is said: "It is the peculiar duty of trial courts to grant a new trial where the verdict is arbitrary or the result of passion, prejudice or misconduct on the part of the jury." And in Yates v. Shanklin, 85 Mo. App. 358, it is said that the court's action in such circumstances will not be questioned in the appellate court, except in case of manifest abuse.

The action of the court in setting aside the verdict should be sustained, unless it appears from the evidence it acted arbitrarily, or that its discretion was unreasonably exercised. The contention of defendant is, that the evidence in regard to the injury does not warrant the finding of the circuit court. This contention requires that some attention be paid to the evidence in respect to the injury.

Dr. Frank Ring, an experienced physician and surgeon, testified on behalf of plaintiff as follows:

"Q. Did you ever have occasion to examine the right arm of the plaintiff, Robert Brent Richardson? A. Yes, sir.

"Q. When did you first examine it? A. On March second of this year.

"Q. Have you examined it since? A. Yes, sir.

"Q. When did you examine it last? A. Two or three weeks ago.

"Q. Will you tell the jury what evidence of injury you found on that right arm? A. There is evidence of fracture above the elbow joint, involving the joint.

"Q. How does that affect the arm? A. He is unable to extend it fully. Its flexion is impaired — the flexion of the elbow joint is impaired.

"Q. To what extent can he extend it? A. About an angle of forty-five degrees, or a little beyond a right angle, I should say he can go now.

"Q. In your opinion, Doctor, will that injury affect the use of the arm in the future? A. The flexion of the arm is impaired permanently."

On cross-examination the above witness further testified as follows:

"Q. Doctor, you say you examined him on March 2, 1905? A. Yes, sir.

"Q. And also two or three weeks ago? A. Yes, sir.

"Q. Did you notice any difference in the condition of the arm as it was on March second and two or three weeks ago? A. Practically, the same.

"Q. Was there any difference? A. An extension was made then and is made now.

"Q. You say it is practically the same; isn't it in better condition now than it was then? A. I don't think so, about the same.

"Q. It isn't any worse? A. I think not.

"Q. Now, Doctor, you simply made an examination of it by baring the arm and passing your hands over the parts, and then drew your conclusion from that, didn't you? A. Partly and partly by palpation.

"Q. What do you mean by that? A. Feeling it and partly by trying to extend the elbow joint.

"Q. You didn't use an X-ray on this arm? A. No, sir.

"Q. Isn't it a fact that you can't really tell actually to what extent these injuries have been, or are, without an X-ray examination? A. No, sir; it isn't a fact.

"Q. Can you tell us what kind of a fracture that is? A. It is a fracture of the lower end of the humerus involving the joint. The inflammation extending into the joint, making it impossible to straighten the joint out. He can raise it up and down, but that is the most he can do with it. "

Dr. Brent Murphy, who treated the injury, testified for defendant. After stating that he had examined plain-

tiff's arm on or about October 5, 1904, witness testified as follows:

"Q. What condition did you find the arm in at that time, Doctor? A. Well, the motion of the arm is all right except that it doesn't straighten perfectly. He can't straighten his arm perfectly, but he can straighten it out about that far (illustrating).

"Q. How many degrees is that, about ninety degrees?

"Mr. Taylor: Forty-five degrees is a right angle.

"Court: Ninety degrees.

"A. This would be about 180 degrees, halfway between right angles — halfway between a right angle and being perfectly straight.

"Q. About halfway between a right angle and being perfectly sraight? A. Yes, sir.

"Q. You say he could use it in every respect except straighten it out at that time? A. Yes, sir.

"Q. What did you find on examination to-day? A. Practically the same thing.

"Q. Was there any improvement — did it extend out further than it did on October fourth? A. I didn't examine it very closely to-day, but it looked to me to be about the same thing.

"Q. Doctor, I will ask you to state the relative use of that arm — its condition now as compared to what it was before it was broken — to its usual function? A. Well, it isn't quite as good as it was before it was broken.

"Q. Well, is it nearly or practically as good as it was for all purposes? A. It is a useful arm, yes, sir.

"Q. Well, now, can you, by examination of it, tell where that fracture was and how it was caused — from an inspection of it at the present time or in October last? A. I could tell by the examination I made in October that the arm had been broken above the elbow.

"Q. How far above the elbow? A. Very close to

the elbow joint, just above these prominent bones of the elbow joint, probably within an inch of the joint.

"Q. But could you tell whether or not there had been any fracture in the joint — elbow joint? A. No, sir.

"Q. There wasn't, I understand? A. I couldn't tell that there had been a fracture into the joint — no, sir; I couldn't tell that."

Witness also stated that his services for treating plaintiff were reasonably worth fifty dollars.

Dr. W. A. Candless, a physician and surgeon, who was called by defendant, testified that he examined plaintiff's arm in 1904, with Dr. Murphy, and also gave the following testimony:

"Q. Well, now, state just what condition you found this right arm in when you examined it a year ago? A. Well, I found the arm was flexed. It was at an angle of sixty-five degrees at that time. It could be extended, I mean, to a point of about sixty-five degrees when I saw it the first time.

"Q. Do you mean 65 or 125? A. I mean if you inclined the angles of the body from a perpendicular — if I hold my arm straight it is ninety degrees, round it that way and its forty-five, and extended out that way it is between forty-five and ninety degrees.

"Q. He could extend it between a right angle and a straight line? A. Yes, sir.

"Q. About half way? A. Yes, sir.

"Q. Now, what was the condition of the arm at that time — how could he use it? A. He could extend it all right to about sixty, about like that (illustrating), just between a right angle and a straight line.

"Q. Now, what condition did you find it in to-day when you examined it? A. When the doctor examined it to-day the extension had increased — it is not complete, there is still a slight inflexion of the arm. The other movements are normal so far as I can determine.

"Q. Now, I will ask you to state, Doctor, did you notice any difference between the arm as you examined it a year ago and the present time? A. Only that the doctor extended it further to-day than I could at that time when I took hold of it.

"Q. Well, now, I will ask you to state what would be the comparative use of that arm now as to what use could be made of it before this fracture occurred? A. Well, there would be some limitation in use in certain pursuits not normal, but it is a very practical and useful arm.

"Q. It is a practical and useful arm now? A. Yes, sir.

"Q. And what will be the chances of that arm as to whether it will become more perfect or less perfect, or remain the same in the future? A. I think it will get better.

"Q. Could you tell from the examinations of the arm at these two different times as to the nature of the fracture or injury or where it was? A. Well, I can say this, that the fracture was above the elbow joint because when I first examined it I felt the callous there, but I don't believe it went into the joint or there wouldn't have been the relative amount of motion that there was there."

Plaintiff testified as follows:

"Q. Now, Robert, after your arm was broken, tell the jury what kind of pain and suffering you had from it. Did it hurt you? A. Yes, sir.

"Q. Does it still hurt you when you use it? A. I don't use it.

"Q. How long were the doctors treating you? How long did they continue to treat your arm, about how long? A. About a month.

"Q. How long did you carry your arm in a sling? A. About a month.

"Q. How much can you use that arm — what can

you raise with that arm?   A.   I can't raise hardly anything.

"Q.   To what extent can you straighten the arm?
A.   (Witness indicated by raising arm.)

"Q.   About how much?   A.   This is all the further.

"Q.   To what extent can you use the arm?   What can you carry in it?   How much weight can you carry on that arm?   A.   I don't know.   I can't carry much on it.   It hurts.   Any time I pick up anything it hurts."

After the injury plaintiff worked two weeks in a glass factory at Valley Park, Missouri.   His duties were to polish glass, and he testified that in polishing glass he only used his left hand.   A witness testified for defendant, that plaintiff used both hands.

There is no substantial conflict in the expert testimony, in regard to the character, extent and permanency of the injury to plaintiff's right arm.   It all goes to show that the elbow joint is seriously and permanently injured, to such a degree that plaintiff is not and never can be able to extend the arm to its full length, and that the injury is such as to prohibit the full use of the arm and to cause plaintiff pain whenever he uses it in a manner requiring strength in the elbow, or a deflexion beyond its capacity, in its injured condition.   Plaintiff is a young boy and if he lives the average life of man, over twenty years of his life will be handicapped by this crippled arm.   Five hundred dollars is a beggarly compensation for such an affliction, and we find that the learned trial judge did not abuse his discretion in granting the new trial, but exercised it judicially and for adequate cause.

The judgment is affirmed.   All concur.