IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION.

---

## JACKSON. APRIL TERM, 1919.

---

JAMES F. HUNTER *et al. v.* MATT STEWART Co., *et al.*

### (*Jackson.* April Term, 1919.)

1. **BILLS AND NOTES.** Payment or purchase of note.

Where a company unable to pay its notes upon which stockholders were indorsers executed to a bank a note payable in four months for the exact amount advanced by the bank to take up said two prior overdue notes, which were not to be canceled or stamped paid but attached as collateral for the money advanced, *held*, the bank became a purchaser and owner of the overdue notes, and that there was no payment thereof. (*Post,* *pp.* 515, 516.)

Cases cited and approved: Cussen v. Brandt, 97 Va., 1; Dodge v. Freedman Savings & Trust Co., 93 U. S., 379; Carter v. Burr, 113 U. S., 737; Swipe v. Leffingwell, 72 Mo., 348; McDonnell v. Burns, 28 C. C. A., 174; Brice's Appeal, 95 Pa., 150; Meredith v. Dibrell, 127 Tenn., 387.

Cases cited and distinguished: Wood v. Guarantee, etc., Co., 128 U. S., 416; Johnston v. Schnabaum, 86 Ark., 82; Hirsch v. People's Bank of Plaquemine, La., 240 Fed., 664.

141 Tenn.]                    (507)

2. **BILLS AND NOTES.** Indorsers. Discharge. Extension of time.
Where a company unable to pay its notes upon which stockholders
were indorsers executed to a bank a note payable in four months
for the exact amount advanced by the bank to take up said two
prior overdue notes, and the overdue notes were not to be can-
celed or stamped paid, but attached as collateral for the money
advanced, *held*, that the rights of the bank against the indorsers
were reserved within the Negotiable Instruments Act. (*Post*,
*pp.* 516-521.)

Cases cited and approved: Place v. McIlvain, 38 N. Y., 96; Na-
tional Bank of Newburgh v. Bigler, 83 N. Y., 51.

Cases cited and distinguished: Morgan v. Smith, 70 N. Y., 537;
National Park Bank of New York v. Koehler, 137 App. Div., 785.

---

### FROM SHELBY.

---

Appeal from the Chancery Court of Shelby Coun-
ty.—Hon. F. H. Heiskell, Chancellor.

Wright, Miles, Waring & Walker and W. H. Borsje,
for plaintiffs.

Thos. M. Scruggs, for defendant,

Mr. Justice McKinney delivered the opinion of
the Court.

The Matt Stewart Company was incorporated for
the purpose of manufacturing and marketing certain
machines patented by Mr. Matt Stewart. The venture
was a failure.

On September 11, 1911, the said Matt Stewart Com-
pany executed a note for $1,600, payable to its own
order, and indorsed by W. M. Goodbar, J. M. Hays,
J. R. Collins, J. C. Canale, and E. Q. Withers.

On October 6, 1911, it executed another note for the same amount, and indorsed by W. M. Goodbar, J. M. Hays, and J. R. Collins. Both notes matured four months from date. In due course and before their maturity, these two notes became the property of the Security Bank & Trust Company of Memphis. The complainants claim to be the present owners of these notes and instituted this suit agaist the maker, Matt Stewart Company, and certain of the indorsers to recover the face value of same, together with interest and attorneys' fees.

The chancellor rendered a decree against defendants for the full amount sued for. Two of the indorsers, J. R. Collins and J. C. Canale, have appealed to this court and have assigned errors.

These notes were executed for the purpose of enabling the Matt Stewart Company to borrow money to be used in the conduct of its business, and these complaining indorsers were stockholders in the company.

In the summer of 1912, the holder of these two notes, Security Bank & Trust Company, turned them over to its attorney, Judge Scruggs, for collection. The Matt Stewart Company had no funds and was unable to take up said notes, and it did not want the indorsers on said notes to have to pay same. The active officers of the company, Mr. Stewart and Mr. Hays, appealed to Mr. Hunter Raine, president of the Mercantile Bank, for financial aid in taking care of this indebtedness. The prospect of the company was fully discussed, and Mr. Raine became interested and thought its outlook was bright. He was fully advised as to these two $1,600 notes, being informed that in one of

them protest was waived and that the other had been legally protested. He testifies that he knew that Collins, Goodbar, and Canale made the notes absolutely good; that he knew that Hays was without means, but that he was an honorable man in whom he had confidence; that he had just met Mr. Stewart, and was advised that he had no property. He thereupon decided to aid this company in its embarrassed condition, and acting for the bank he turned over to Hays and Stewart $3,537.20, being the amount necessary to take up these two notes, with instructions not to have the notes canceled or stamped paid, and to bring the notes to the bank to be held as security or collateral for the money so advanced; and these instructions were fully carried out, with the exception that Stewart and Hays, instead of taking the money to Judge Scruggs, deposited the money to the credit of Matt Stewart Company, and gave Judge Scruggs a check against said deposit for said two notes. This was on August 10, 1912.

On August 12, 1912, the Matt Stewart Company executed to the Mercantile Bank its note for $3,537.20, the exact amount advanced by said bank to take up the said two $1,600 notes. This note was payable four months from date, and was indorsed by Stewart and Hays, and the two $1,600 notes were attached as collateral thereto. This note was renewed several times, and the two $1,600 notes were always attached to the renewal notes. The $3,537.20 note, as well as the renewal notes, contained the following provision:

"The undersigned also hereby agrees to give said bank, or its assigns, such additional collaterals as its president or cashier may at any time demand, and if

said additional collaterals shall not be promptly given when demanded, this note shall become immediately due and payable.''

Mr. Raine, when asked as to why he took the $3,537.20 note, said:

''The reason I had the Matt Stewart Company to make a new note was this: Banks don't buy past-due paper; the best they can do is to loan the money on past-due paper, and hypothecate the past-due paper as collateral security to the collateral loan. All banks have more or less past-due paper; a good bank has as little as possible; it is not good banking to have much past-due paper. I just stated that the only way we could loan money in a businesslike manner on this paper was by having a collateral note executed, and this paper hypothecated as collateral security.''

Mr. Raine also testified that he wanted to give the Matt Stewart Company further time and to aid it in saving harmless the indorsers on its notes.

Mr. Raine further testified as follows:

''Q. Was this to be the Mercantile Bank's paper, that is, the two $1,600 notes, after it was taken up by you, or was it to be the Matt Stewart Company's paper?

''A. How could it be the Matt Stewart Company's paper?

''Q. The Mercantile Bank paid the money for the paper?

''A. Certainly.

''Q. And it was the Mercantile Bank's paper?

''A. Until the debt was paid.''

Mr. Hays testified as follows:

"Well, according to my recollection about the transaction is just this: That to keep the indorsers from being sued and the company on the two $1,600 notes held by Judge Scruggs for the Security Bank, we saw Mr. Hunter Raine at the Mercantile Bank and asked him to let us have the money to take these two notes up with. He thought well of the company, and he said he would let us have the money to take the notes up on the 'condition,' used that word, if we would bring the notes back alive so that we could put them as security for the money."

Mr. Raine and Mr. Hays both testify that the two $1,600 notes were to remain alive and become collateral to the $3,537.20 note. This testimony is not controverted.

Without quoting further from the evidence, we think the testimony shows that: First, Mr. Raine though that the future of the Matt Stewart Company was bright and that if given a little time it would pay out and save the indorsers. Second, that the two $1,600 notes were well secured. · Third, that it undertook to purchase these two notes, and that it did not intend to pay them off. Hays and Stewart were its agents in taking up these notes, and the fact that they deposited the money to the credit of the company and gave its check, instead of taking the money to the holder of the notes, did not change the result.

A transaction of this nature is always governed by the intention of the parties.

*Cussen* v. *Brandt,* 97 Va., 1, 32 S. E., 791, 75 Am. St. Rep., 762, was a case where a third party took up notes for investment at a ·bank in which same had been

placed for collection. The question presented was whether this action worked a payment of the notes, or did the third party so acquiring the notes become a purchaser of them?

Says the court (97 Va., 7, 32 S. E., 793, 75 Am. St. Rep., 762):

"Whether a transaction like this is a payment or a purchase is a question of intention—of fact rather than of law—and is to be settled by the evidence. *Wood* v. *Guarantee, etc., Co.,* 128 U. S., 416 [9 Sup. Ct., 131, 32 L. Ed., 472]."

And on page 8 of 97 Va., on page 793 of 32 S. E. (75 Am. St. Rep., 762), said court says further:

"The authorities hold that a transaction like that under considertion is a purchase, and not a payment. It was said by the supreme court of the United States, in a case similar to this upon the question under consideration, that 'in cases like that before us, where the intention is to continue the existence of the note and not to cancel it by payment is made evident, when the money is paid to the collecting agent appointed to receive it, and the owner of the note receives the amount due to him, the authorities sustain the transaction as a purchase.' *Dodge* v. *Freedman Savings & Trust Co.,* 93 U. S., 379 [123 L. Ed., 920]; . . . *Carter* v. *Burr,* 113 U. S., 737 [5 Sup. Ct., 713, 28 L. Ed., 1147]; *Swipe* v. *Leffingwell,* 72 Mo., 348; *McDonnell* v. *Burns* [83 Fed., 866] 28 C. C. A., 174; Brice's Appeal, 95 Pa., 150."

In *Johnston* v. *Schnabaum,* 86 Ark., 82, 109 S. W., 1163, 17 L. R. A. (N. S.), 838, 15 Ann. Cas., 876, it is said:

"Appellee was a stranger to the contract represented by the note, and a payment by him of the amount and delivery to him of the note will be held to be a purchase until an intention to the contrary is shown." 7 Am. & Eng. Ency. Law, 1025.

In *Hirsch* v. *People's Bank of Plaquemine, La.* (1917, United States Circuit Court of Appeals), 240 Fed., 664, 153 C. C. A., 459, the court said:

"The rule invoked does not stand in the way of even the maker of matured notes, or one who has assumed the obligation of the maker, arranging for a transfer of them from a holder who is unwilling to grant a desired extension of the time of payment to one who consents to buy and hold them as an investment. The maker may act as an intermediary in carrying out such an arrangement when made, as by procuring a third person to pay the transferor the consideration for the transfer prior to the time when the agreed transfer is to be consummated by the transferee paying the consideration and taking the notes. Where, as in this case, all the parties to the transaction . . . intended a purchase by Mr. Hirsch of the notes held by Dr. Hollowell, with the security unimpaired, and understood at the time that this result was accomplished by what was done, the transaction is to be given effect as a purchase without regard to the mode adopted to accomplish the intended result."

In 7 Cyc., 1025, it is said:

"If a bill or note is paid after its maturity by a stranger to the paper, it will in general be held to be a purchase and not a payment of the instrument. Whether it is a payment or a purchase is, however, a

question of intention to be determined as a fact from the acts and declarations of the parties and the surrounding circumstances. (Citing many cases.) If the parties to the transaction clearly intended to purchase, it will operate as such without regard to the mode adopted of accomplishing the result.''

In 8 Corpus Juris, 583, it is said:

''On the other hand, where a third person purchases a note in good faith, as for an investment, the fact that the purchase is made for him by the maker as his agent does not extinguish the note either as to the maker or as to a surety; and the fact that a note, after having been put into circulation by the maker for value, comes into the hands of the latter as an agent of a third party, will not defeat recovery thereon by the latter.''

Again in 8 Corpus Juris, 581, it is said:

''The possession of an instrument by the party obligated to pay the same is evidence of payment, and possession by a stranger is *prima-facie* evidence of indebtedness.''

We are therefore of the opinion that the Mercantile Bank became the purchaser and owner of the two $1,600 notes after their maturity.

There was no express agreement for delay or extension of time as to the old notes. There was no agreement that the new note should be accepted in payment of the old notes. The agreement was that the old notes should remain alive and be attached as collateral to the new note, which was done. It is manifest from the evidence that the purpose in taking the new note was to avoid carrying past-due paper, and to

give the maker further indulgence and at the same time
to hold the indorsers on the old notes liable.

Under our Negotiable Instruments Act (Laws 1899,
chapter 94), as construed in *Meredith* v. *Dibrell,* 127
Tenn., 387, 155 S. W., 163, 46 L. R. A. (N. S.), 92 Ann.
Cas., 1914 B, 1079, this could have been accomplished
either by agreement on the part of the indorsers or by
expressly reserving, at the time the new note was
taken, all of its rights against the indorsers. It is
admitted that there was no agreement on the part of
the indorsers to this arrangement.

The remaining question, therefore, is:    Were the
rights of the bank against these indorsers expressly
reserved within the meaning of the Negotiable Instru-
ments Act?

In *Meredith* v. *Dibrell,* supra, the court quoted ap-
provingly from *Morgan* v. *Smith,* 70 N. Y., 537, as
follows:

"The ground upon which a surety is held dis-
charged when further time for payment is given the
principal debtor is that the rights of the surety are
varied, as he cannot then, when the debt is due and
payable, make payment, and thus put himself in the
place of the creditor according to the original implied
contract, and enforce repayment from the principal.
Where the remedies of the creditor are reserved
against the sureties, notwithstanding the new agree-
ment with the principal, the situation of the parties is
not varied, and the rule does not apply.    When the
creditor proceeds against the surety in such case, and
the surety pays, he is then entitled to the place of
creditor, as it was originally, and may in turn enforce

the principal, who may not set up against the surety the new arrangement with the creditor.''

While the bank, speaking through its agent and officer, Mr. Raine, did not use the exact words of the act, by taking the new note, with the express understanding that the old notes were to remain alive and become collateral to the new, the bank insists that it just as effectively reserved its rights as if it had said, ''All rights against the indorsers on the old notes are expressly reserved.'' In other words, if the old notes continued to be alive, there was nothing to prevent the bank from suing on them at any time.

We are of the opinion that this insistence of the bank is well taken. We see no reason why the parties could not make an agreement of this nature. It is not necessary for us to pass upon the question as to whether the bank could sue the maker before the new note became due. What we hold is that the bank could have sued the indorsers on the old notes at any time, or the indorsers could have paid these notes at any time, and in either event immediately sued the maker. How could the maker have defended such an action by saying that it had been granted an extension of time, when at the time of the extension it had agreed that the old notes should remain alive, which meant, in legal effect, they being past due, that the holder could sue thereon at any time? The maker, having obtained this extension or renewal on its agreement that the old notes should remain alive and become collateral to the new note, would be estopped to make such a defense. To hold otherwise would be to hold that this plain, positive agreement of the parties was without force or effect and

amounted to absolutely nothing. It should be remembered that one of the $1,600 notes waived protest, and the other one had been duly protested.

We have found one rather late case that is in point, the case of *National Park Bank of New York* v. *Koehler,* 137 App. Div., 785, 122 N. Y. Supp., 490, which we copy in full, but, before doing so, call attention to the fact that the Negotiable Instruments Act of New York is the same as ours. Said opinion follows:

"This suit is brought against the defendant as indorser of a promissory note for $15,000, made on the 22d day of March, 1907, by the Para Recovery Company, a corporation, and discounted by the plaintiff. Shortly before the maturity of that note, the maker requested an extension or renewal, proposing to give new notes maturing at intervals, indorsed by its president instead of by the defendant, giving as a reason for not procuring the indorsement of the latter that he was out of the country and might not return within two or three months. In reply to that, the plaintiff refused to accept new notes, not indorsed by the defendant, giving as a reason that the loan was made on his responsibility. In reply to that, the maker again wrote the plaintiff inclosing the proposed new notes, indorsed by its president, and saying:

" 'In the meantime, we can only assure you that we will pay the notes as they fall due and we suggest that you hold the old note with Mr. Koehler's indorsement as collateral until the new notes are paid, as a way out of the difficulty.'

"Thereupon and on the 22d day of July, 1907, the date of the maturity of the note in suit, the proceeds

of the new notes were credited, and the note in suit was charged on the plaintiff's books to the account of the maker. At the same time, the note in suit was protested for nonpayment and due notice thereof given to the defendant.

"The question is whether the legal effect of the transaction above outlined was an unconditional extension of time, granted by the plintiff to the principal debtor. Plainly, the note in suit was not paid. The bookkeeping entries made by the plaintiff for convenience are of little significance. The protest of the old note and the giving of notice thereof are very significant, and show an unmistakable intention on the plaintiff's part to reserve its rights against the defendant. Were there nothing in the case but the letter, containing the statement above quoted, and the acceptance by the plaintiff of the notes therewith sent, it might be difficult to escape the conclusion that the transaction operated to suspend the right to sue on the old note until the maturity of the new (*Place v. McIlvan*, 38 N. Y., 96, 97 Am. Dec., 777); but that statement must be read in the light of the plaintiff's previous unequivocal refusal to accept new notes not indorsed by the defendant, and its subsequent protest of the note in suit and giving notice thereof. It ·seems to me that the fair inference from the entire transaction is that the plaintiff absolutely reserved its right to proceed forthwith against the defendant, and that the extension of time was conditional upon the defendant's consent. It is to be noted that the statement, above quoted, says that the note with the defendant's indorsement is to be held 'until the new notes are paid,' not that it is to be held until they are

due.  As all rights against the surety were reserved, if he did not consent, the notes might have to be paid before they were in terms due.  There can be no doubt that both parties understood that the new notes were accepted subject to the preservation of the defendant's liability as indorser, and it is difficult to believe that they did not know the familiar rule that an unconditional extension granted the principal without the surety's consent discharges the latter.  Of course, the last suggestion could not be considered in the face of an unequivocal agreement to extend the time, but in this case no such agreement is to be found.  What the parties intended has to be inferred from the entire transaction, from words and acts, and I do not think it can be said as matter of law that they intended an unconditional extension.  The notice or protest informed the defendant that he was to be held liable on his indorsement.  He could then have taken up the note and sued the maker, and I think it was at least a question of fact whether the parties did not intend to reserve his right to do that, to make the acceptance of the new notes by the plaintiff subject to that right.

"It seems profitless to discuss the authorities, as the rules of law are well settled.  Each case turns on the intention of the parties, which is a question of law, if their acts and words are unequivocal; a question of fact, if different inferences may be drawn.  *National Bank of Newburgh* v. *Bigler,* 83 N. Y., 51, and cases therein cited on page 66 of the opinion, support the conclusion which I have reached.

"The judgment should be affirmed, with costs."

We think the agreement in the instant case to keep the old notes alive showed an unmistakable intention on the part of the bank to reserve its rights against the indorsers just as much so as the protest of the note in the Koehler Case showed such intention.

We are therefore of the opinion that the chancellor was correct in holding that the defendants were liable, and his decree is in all things affirmed, with costs.